**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Hector R. CALLES, Defendant-**
**Appellant.**

**No. 72–3195**
**Summary Calendar.***

United States Court of Appeals,
Fifth Circuit.

July 11, 1973.

Rehearing Denied Aug. 6, 1973.

---

* Rule 18, 5th Cir.; see Isbell Enterprises, Inc. v. Citizens Casualty Co. of New York et al., 431 F.2d 409, Part I, (5th Cir. 1970).

Lawrence E. Hoffman, Miami Beach, Fla., for defendant-appellant.

Robert W. Rust, U. S. Atty., Miami, Fla., Scott P. Crampton, Asst. Atty. Gen., Meyer Rothwacks, Atty., Tax Div., Dept. of Justice, Washington, D. C., for plaintiff-appellee.

Before THORNBERRY, GOLDBERG and RONEY, Circuit Judges.

RONEY, Circuit Judge:

After a jury trial, appellant Hector R. Calles was convicted on two counts of willfully attempting to evade and defeat his income tax liability for the years 1969 and 1970, in violation of 26 U.S.C. A. § 7201. He was sentenced to two concurrent four-year terms in prison. On appeal, appellant contends (1) that the Government failed to establish, by means of the "net worth method," that he had taxable income during the years charged in the indictment, and (2) that various trial errors entitle him to a new trial. We affirm.

At the trial, the Government developed this preliminary evidence: Appellant Calles is a Cuban citizen born in 1931, has a college education plus two years of law school in Cuba, and claims to have been a government official in the early days of the Castro government. He entered the United States illegally in 1962 and has eluded the Immigration authorities ever since. He has never filed an income tax return. He established residence in Miami, but he has held his assets in the name of others. For example, his $68,000 home is in his wife's name, his yacht, Roxanna II, has been held in the names of at least two and possibly three friends, and his automobiles were registered under the name of "Santora."

According to the testimony of several federal and state law enforcement officials, appellant claimed various employments and occupations in conversations with them. For example, on May 25, 1968, he claimed to be in the jewelry business. On December 6, 1969, he said that he was the owner or manager of a ladies' wear store. On November 17,

1970, he told police that he was a merchant. On December 13, 1970, he said that he was a lobsterman and lobster dealer in Miami and the Bahamas.

In interviews with Government agents, appellant discussed what he termed his business activities in this country. He claimed that, after several years of inactivity subsequent to entering the United States, he invested and lost $32,000 in a partnership named Ablado Couture; engaged in an illegal nightclub operation in which he asserts that he invested $19,000; invested and lost $2,500 in a firm called B. A. U. International; in 1968 invested between $25,000 and $30,000 in the Roxanna Boutique in New York. This last claimed investment, however, was cast in doubt or at least clarified by the statement of Yolanda Alonzo, appellant's mother-in-law. When contacted by Government agents, Mrs. Alonzo stated that she was the owner of the Roxanna Boutique and that appellant's only investment was $2,000.

When questioned about his income, appellant gave two "sources" of funds. First, he claimed that many people brought money out of Cuba to him, from a hoard that he had built up as a Cuban official. He named only two such people and, since both of them had fled to other countries to avoid criminal prosecutions in the United States, his claim could not be verified. Second, appellant told the Government agents that he could call certain persons who would give money to him if he asked for it. He refused to identify these persons, but he told the Government agents that he would kill these people if the money was not forthcoming.

At the trial, appellant testified that his wife had no independent income during the years specified in the indictment, and he stated that his wife had never received any inheritances, gifts, or loans.

## I.

To sustain a conviction under Section 7201, the Government must prove three elements: the existence of a tax deficiency, willfulness, and an affirmative act constituting an evasion or an attempted evasion of the tax. Sansone v. United States, 380 U.S. 343, 85 S.Ct. 1004, 13 L.Ed.2d 882 (1965).

The Government employed the "net worth method" to establish the tax deficiency here. The procedure for this method was approved in Holland v. United States, 348 U.S. 121, 125, 75 S.Ct. 127, 130, 99 L.Ed. 150 (1954):

> In a typical net worth prosecution, the Government, having concluded that the taxpayer's records are inadequate as a basis for determining income tax liability, attempts to establish an "opening net worth" or total net value of the taxpayer's assets at the beginning of a given year. It then proves increases in the taxpayer's net worth for each succeeding year during the period under examination and calculates the difference between the adjusted net values of the taxpayer's assets at the beginning and end of each of the years involved. The taxpayer's nondeductible expenditures, including living expenses, are added to these increases, and if the resulting figure for any year is substantially greater than the taxable income reported by the taxpayer for that year, the Government claims the excess represents unreported taxable income.

See also United States v. Massei, 355 U.S. 595, 78 S.Ct. 495, 2 L.Ed.2d 517 (1958); United States v. Newman, 468 F.2d 791 (5th Cir. 1972), cert. denied, 411 U.S. 905, 93 S.Ct. 1527, 36 L.Ed.2d 194 (1973); United States v. Penosi, 452 F.2d 217 (5th Cir. 1971), cert. denied, 405 U.S. 1065, 92 S.Ct. 1495, 31 L.Ed.2d 795 (1972).

The Government's computation of appellant's taxable income for the years in question shows a net worth of $0 on December 31, 1968; $15,521.42 on December 31, 1969; and $64,898.33 on December 31, 1970. Thus, according to the Government's figures, appellant's net

worth increased by $15,521.42 during 1969 and by $49,376.91 during 1970. Combining these figures with proven non-deductible expenditures, the Government's expert calculated a tax liability of $4,117.82 for 1969 and $19,135.93 for 1970.

1. Appellant contends that the zero net worth figure is not supported by the proof and is in fact contrary to his mode of living during 1968, the preprosecution year. We disagree. When appellant arrived in this country in 1962, he made a sworn statement that his assets consisted of only $925. In late 1962, he was living in a $60 per month room and his last month's rent had been paid by a friend. Also in 1962, he borrowed $2,500 from a friend, a debt that remains unpaid. In 1963, he excused his burglary of a store by claiming that he needed funds to buy medicine. In 1967 or 1968, he was unable to pay the $1,000 medical expenses incurred with the birth of a child, so he was forced to seek financial assistance from his mother-in-law. In 1969, when he bought a $28,000 home he was unable to make the required down payment and was forced to resort to second and third mortgages, the latter for $600.

We recognize that the "net worth method" requires an accurate and definite showing of an opening net worth, for that figure is the keystone of the "net worth method" calculation process. Nevertheless, the Government's evidence provides substantial and sufficient support for the jury to conclude that appellant's zero net worth at the close of 1968 had been established with the requisite "reasonable certainty." Holland v. United States, *supra,* 348 U.S. at 132, 75 S.Ct. 127.

2. Appellant contends that the Government was required to prove a likely source of income *and* to negate all possible sources of nontaxable income. This argument incorrectly states the law. As the Supreme Court made clear in United States v. Massei, *supra,* 355 U.S. at 595, 78 S.Ct. at 495: "In *Hol-*

*land* we held that proof of a likely source was 'sufficient' to convict in a net worth case where the Government did not negative all the possible nontaxable sources of the alleged net worth increase." Thus, the rule is that the Government in a "net worth method" case must either prove a likely source of income *or* negate all possible sources of nontaxable income. It need not do both.

In the case before us, the Government presented evidence of both of these alternatives. First, appellant's statements that people who refused to send money to him when asked were killed established him as an extortionist and provided a likely source of taxable income. Second, appellant's statement to the Government agents that he had no income except that from his extortions and from his failing businesses indicates no nontaxable source of income. Finally, we note the Supreme Court's admonition in *Holland, supra:*

> But where relevant leads are not forthcoming, the Government is not required to negate every possible source of nontaxable income, a matter peculiarly within the knowledge of the defendant.

348 U.S. at 138, 75 S.Ct. at 137. *See also* United States v. Newman, *supra.* The Government's proof was sufficient on this point.

3. Appellant contends that the evidence does not support a finding of either willfulness or affirmative conduct by him. He claims that his mere failure to file a return does not constitute a sufficient willful, affirmative act to satisfy Section 7201.

What must the Government show to establish the necessary affirmative willfulness? In Spies v. United States, 317 U.S. 492, 63 S.Ct. 364, 87 L.Ed. 418 (1943), the Supreme Court spoke to this requirement:

> By way of illustration, and not by way of limitation, we would think affirmative willful attempt may be inferred from conduct such as keeping a double set of books, making false en-

tries or alterations, or false invoices or documents, destruction of books or records, concealment of assets or covering up sources of income, handling of one's affairs to avoid making the records usual in transactions of the kind, and any conduct, the likely effect of which would be to mislead or to conceal.

317 U.S. 499, 63 S.Ct. 368. Other courts have held that willfulness may be inferred from such actions as holding assets in others' names, Chinn v. United States, 228 F.2d 151 (4th Cir. 1955), making false explanations, United States v. Callanan, 450 F.2d 145 (4th Cir. 1971), and making inconsistent statements to Government agents, United States v. Jett, 352 F.2d 179 (6th Cir. 1965), cert. denied, 383 U.S. 935, 86 S. Ct. 1063, 15 L.Ed.2d 852 (1966). Moreover, this Court recently stated in United States v. Newman, *supra*, that "[i]t is clear that making false statements to Treasury agents for the purpose of concealing income constitutes a sufficient affirmative act to satisfy [Section] 7201." 468 F.2d at 794.

■ In the case at bar, appellant held all of his assets in others' names. He made false and inconsistent statements and explanations, such as his $25,000 alleged investment in the Roxanna Boutique which in reality was but a $2,000 investment, his various claimed occupations, and his claim of a cash hoard in a friend's safety deposit box that was proven to be empty. He made false statements to Treasury agents, such as denying that he owned a boat. Moreover, appellant admitted that he was aware that he should have filed income tax returns. Hence, the jury could infer affirmative willfulness from these facts.

## II.

Appellant contends that several errors during the trial mandate reversal for a new trial. We find no merit to these contentions, either singly or in combination.

■ 1. Appellant argues that the trial court erred when it permitted the Government to introduce evidence of his financial condition in 1962, 1963, and 1967. He rests this objection on two bases: first, that the evidence was irrelevant, since the indictment charged only crimes allegedly committed in 1969 and 1970; and second, that the evidence, even if relevant, was too remote.

We find no error here. Appellant had claimed that his 1969 and 1970 expenditures were made out of a cash hoard brought to this country from his native Cuba. Thus, his standard of living and his statements were relevant to prove or to disprove its existence. The same issue surfaced in Holland v. United States, *supra*, where 1948 was the prosecution year and evidence of taxpayers' behavior in the 1920's and 1930's was admitted to negate the existence of the hoard. Certainly, since *Holland* requires the Government to investigate all exculpatory leads and explanations offered by the defendant in a "net worth method" case and to show in court the results of that investigation, once appellant raised the defense of the hoard then the Government was required to rebut it. The evidence here objected to was neither irrelevant nor too remote.

2. Appellant contends that the District Court erred in permitting several law enforcement officers to testify about conversations that they had had with appellant. He argues that, even if relevant, that evidence should have been excluded because its prejudicial and inflammatory effect outweighed its relevancy.

■■ A District Court has wide discretion in determining relevancy and materiality, and its ruling will not be disturbed absent a showing of an abuse of that discretion. United States v. Allison, 474 F.2d 286 (5th Cir. 1973); United States v. Garr, 461 F.2d 487 (5th Cir.), cert. denied, 409 U.S. 880, 93 S.Ct. 170, 34 L.Ed.2d 135 (1972); O'Brien v. United States, 411 F.2d 522 (5th Cir. 1969). Although the rule is clear that

the prosecution must not employ evidence of prior crimes for the purpose of showing either the defendant's criminal character or his propensity to commit crimes, *e.g.* United States v. Garber, 471 F.2d 212 (5th Cir. 1972), nevertheless evidence of prior criminal conduct is admissible if relevant for another purpose and if its probative worth is not outweighed by its prejudice. *See, e.g.,* United States v. Payne, 467 F.2d 828 (5th Cir. 1972), cert. denied, 410 U.S. 912, 93 S.Ct. 975, 35 L.Ed.2d 275 (1973).

■ . Applying this balancing test, we conclude that the officials' testimony did not unfairly prejudice appellant. Only one witness testified about a particular violation of the law, and that testimony established that appellant had justified a burglary by complaining that he needed money to buy medicine. The testimony was plainly relevant to rebut appellant's claim of a cash hoard. Moreover, the jury was cautioned twice about the limited purpose of this testimony. The District Court acted well within its discretion in dealing with this testimony. *Cf.* United States v. Abshire, 471 F.2d 116, 118 (5th Cir. 1972) ("The inclusion of references to 'jail' or 'prison' does not disqualify essential, otherwise relevant, testimony").

■ 3. Appellant complains that he was denied a fair trial when he was not permitted to examine his Immigration and Naturalization Service file. At the trial, in response to appellant's motion to examine the file, the Government admitted that the file might contain exculpatory material, searched the file briefly, and tendered the single exculpatory item producible under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). When appellant renewed his motion to examine the file, the District Court held an in camera inspection of the file and denied production, ruling that the file contained no material relevant to appellant's defense. This ruling was correct. The file contained no statements of Government witnesses, and appellant had no right under either Rule 16, F.R.Crim.P., or the Jencks Act, 18 U.S.C.A. § 3500, to examine it.

■ 4. Appellant contends that the District Court erred when it "cut off" his attempts to disprove the zero net worth figure established by the Government for the preprosecution year of 1968. He points to two such instances. First, when cross-examining the Government's "net worth method" expert, appellant's counsel was not permitted to inquire about the income figure developed for 1968. Second, appellant later attempted to introduce this evidence directly, but was again unsuccessful. These rulings were correct. Appellant's income in 1968, as derived from his expenditures for that year, was irrelevant to disprove his net worth at the close of that year.

■ 5. Finally, appellant contends that he was denied a fair trial because the jury took with it into the jury room an exhibit containing an inadmissible statement by appellant admitting that he had been previously arrested for carrying a concealed weapon. During the trial, counsel for both appellant and prosecution had agreed that that particular statement was irrelevant and should be excised before the exhibit was given to the jury. The trial court instructed both counsel to check the exhibits before the jury received them, but neither attorney noticed the failure to delete the objectionable statement. After about three hours, appellant's counsel remembered that the statement had not been excised and notified the Court. After the exhibit had been removed from the jury room, with the statement not deleted, the Court examined the jury members and concluded that there was no reasonable possibility that any prejudice had inured to appellant.

This . error does not require a new trial. First, the trial court asked each juror if he or she remembered examining that particular exhibit. No one answered affirmatively. The Court then

instructed the jury to disregard anything that they might have seen on the exhibit in question. We discern no error in either this procedure or the Court's conclusion that the trial process had not been irretrievably tainted. Second, upon discovery of the error, appellant's counsel did not move for a mistrial; he sought only the cautionary instruction that was given. Having made a conscious choice not to move for a mistrial, appellant may not now on appeal complain of the trial court's failure to declare one. Ladakis v. United States, 283 F.2d 141 (10th Cir. 1960).

Even if this set of circumstances constituted error, we conclude that it was harmless beyond reasonable doubt. Appellant was entitled to a fair trial, not a perfect one, and in our judgment he received a fair trial. United States v. Harden, 469 F.2d 65 (5th Cir. 1972):

> Rarely, if ever, is a hotly contested adversary proceeding conducted perfectly, but in our judgment appellant received a fair trial in this case.

469 F.2d at 66.

Affirmed.