UNITED STATES of America, Plaintiff-Appellee,

v.

Dorothy R. GARBER, Defendant-Appellant.

No. 78–5024.

United States Court of Appeals, Fifth Circuit.

Feb. 14, 1979.

Rehearing En Banc Granted March 26, 1979.

Charles Clark, Circuit Judge, dissented and filed opinion.

Samuel S. Forman, Hollywood, Fla., Lawrence R. Metsch, Miami, Fla., for defendant-appellant.

Jack V. Eskenazi, U. S. Atty., Marsha L. Lyons, Asst. U. S. Atty., Miami, Fla., for plaintiff-appellee.

Before WISDOM, AINSWORTH and CLARK, Circuit Judges.

AINSWORTH, Circuit Judge:

This direct criminal appeal involves the novel question of the taxability of income derived from the sale of a person's own blood plasma. Dorothy R. Garber was convicted after a jury trial of one count of a three-count indictment charging income tax evasion in violation of section 7201 of the Internal Revenue Code of 1954, 26 U.S.C. § 7201 (1976),[1] and appeals. We affirm the conviction.[2]

---

1. 26 U.S.C. § 7201 provides:

 Any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, shall be fined not more than $10,000, or imprisoned not more than 5 years, or both, together with the costs of prosecution.

2. Appellant was sentenced to imprisonment for 18 months, with 60 days to be served in a "jail-type institution" and the remainder of the sentence of confinement to be suspended. The district court also ordered her placed on probation for a period of 21 months beginning immediately upon her discharge from incarceration and ordered the payment of a $5,000 fine during the first year of probation.

Appellant Garber's blood has substantial commercial value due to the presence of an extremely rare antibody known to be possessed by only two or three other persons in the world. This antibody is used in the production of diagnostic reagents for blood typing serums. Garber's blood has a very rare Rh factor and she produces the antibody as an immunological response to the introduction of blood with a different Rh factor into her bloodstream. The unusual character of appellant's blood first became evident as a result of several pregnancies between 1955 and 1965 and of blood transfusions administered in the course of those pregnancies.

In late 1967, Dade Reagents, Inc. of Miami, Florida approached appellant, who then lived in Oshkosh, Wisconsin, with an offer to travel to Miami for discussions regarding the sale of her blood plasma. On December 29, 1967, Garber entered into a contract with Dade providing that Dade would have the exclusive right to withdraw her blood plasma for conversion into a marketable serum and would pay her between $200 and $500 per "bleed" depending on the concentration of antibodies or titre of her blood. The commercial exploitation of appellant's blood involved two separate steps: stimulation and plasmapheresis. Stimulation involved increasing the concentration of antibodies in her blood by injecting small amounts of selected human red blood cells into her blood; this procedure heightened her existing immunity to blood with a foreign Rh factor. Plasmapheresis is a process in which whole blood is removed from a donor and immediately centrifuged to separate the red blood cells from the plasma or watery part of the blood. The red blood cells are then transfused back into the donor's body. As a donor can safely give whole blood only about eight times per year but can give blood plasma as often as twice a week, the use of plasmapheresis dramatically increased the volume of antibodies that could be taken from appellant during any given period of time. This process is generally repeated twice at a session and requires about an hour and a half to recover a pint of plasma; due to the small size of

appellant's veins, however, it usually took her two and a half hours.

At the time she signed the contract with Dade, Garber also executed a comprehensive release .stating that she was aware of the presence of the Rh antibodies in her blood and of their danger to any children she might carry with an incompatible Rh factor and to her if she received a transfusion of incompatible blood. She acknowledged that she had received advice not to have more children and that she had been informed of the nature and purpose of the procedures to be performed. Finally, she released Dade from liability for any damage, injury or loss that might result from stimulation or the withdrawal of blood. She routinely signed releases when blood was taken.

The process of stimulation caused a number of unpleasant side effects, including dizziness, severe headaches and muscle aches, which lasted approximately two weeks after the injection of the foreign blood cells. The process of plasmapheresis also involved pain and discomfort. On occasion the technician would have difficulty situating the needle properly in the veins in appellant's arms, allowing blood to seep into the tissues around the vein creating a minor hematoma or even hitting a nerve. These difficulties could produce lingering soreness and stiffness of the arms. In addition, Garber inevitably suffered a certain amount of scarring of the veins in her arms and ran the remote risk of contracting hepatitis or having an air bubble introduced. into her bloodstream. An expert testified at trial, however, that there should be no untoward effects if the process is done properly.

Joseph N. Potts, a former Dade superintendent, testified at trial that, when appellant first began selling blood plasma to Dade, he wanted her to be informed concerning the taxability of the payments made to her. A memorandum dealing with taxation was prepared for Garber, and Potts discussed the matter with her in his office. At Dade's suggestion a savings account was opened in Garber's name in

which Dade was to deposit a portion of the payments to her so there would be funds available to pay income taxes. Dade made deposits in this account from 1967 to 1969 and the statements of earnings accompanying the checks issued to Garber during this period bore the notation "less accrual for taxes." She did not, however, pay the money in the account to the Government but gradually withdrew it for a variety of personal uses. Appellant testified at trial that she did not recall Potts telling her anything about taxes and, although she remembered the savings account, she stated that she did not recall that the account was for taxes or that the statements were marked "less accrual for taxes." She also testified that she filed a return for the 1969 tax year on which she had written: "I have no W–2 forms as my income was made up entirely from donating blood plasma from various blood banks." An employee of the IRS District Director's Office, however, later testified that the IRS had no record of a return for 1969 having been filed.

In January 1970, having terminated her relationship with Dade, appellant began an association with Biomedical Industries, Inc. A contract signed February 25, 1970 provided for the payment of $700 per bleed and on March 1, 1972 Biomedical agreed to pay Garber up to $1,600 per bleed. In addition to these payments, Biomedical paid her a salary of $200 per week, provided her with a Lincoln Continental automobile, and paid her a sum of money in lieu of the life insurance that Biomedical had agreed to obtain but for which Garber was unable to qualify. Finally, under the 1970 agreement she received 1,000 shares of Biomedical's common stock and the 1972 agreement provided for a bonus of $25,000 for signing.

With regard to the $200 per week salary, Biomedical withheld money for tax purposes and issued appellant W–2 forms. As to the other payments and benefits, Biomedical treated appellant as an independent contractor and withheld nothing. It issued to her copies of Form 1099, an information return form, stating the amount of these latter earnings. Although Garber ostensibly received the salary of $200 per

week for attempting to find other donors, aside from speaking to her twin brother she did nothing to earn this money. She testified at trial that it was her understanding that this salary represented additional compensation for the sale of her blood plasma to Biomedical. Appellant reported this salary on her income tax returns for 1970, 1971, and 1972; she did not report any other compensation for these years.

On June 13, 1973, IRS Special Agent Ted F. Brown met with appellant and her then husband to discuss their joint income tax return for 1971. At that meeting she told Brown that the return was true and correct, that the W–2 form attached to the return reflected payments for employment as a secretary for Biomedical, that she had received no income from Biomedical other than that indicated on the W–2 form, and that she had never had a savings account. Two days later, on June 15, 1973, Brown had a second meeting with appellant at her request; she indicated that she had not wanted to discuss certain matters in her husband's presence since they were in the process of getting a divorce. At this interview she told Brown that she earned money selling blood plasma to laboratories but that she believed that this money was not taxable because the plasma was part of her body. She brought the 1099 forms for 1970 and 1971 with her, but stated that she did not know their purpose and had never tried to find out.

On March 24, 1977, appellant was charged in a three-count indictment with willfully and knowingly attempting to evade and defeat a large part of the income tax owed by her for the years 1970, 1971, and 1972. She and her husband had filed joint returns for those years reporting taxable income of $7,593.34 for 1970, $13,603.60 for 1971, and $9,512.80 for 1972. The indictment alleged that their taxable income was actually $91,-426.06 in 1970, $84,821.55 in 1971, and $96,-477.50 in 1972. Appellant's husband was not indicted and Garber entered a plea of not guilty to all three counts. At trial the jury returned a verdict of not guilty as to the first two counts and guilty as to the third. At the time of trial in 1977, appel-

lant was 42 years old, divorced and the mother of three children, ages 22, 18 and 12.

Appellant raises three issues on appeal. First, she contends that the district court erred in deciding as a matter of law that the funds received for the sale of plasma constituted taxable income and in instructing the jury accordingly. She argues that these payments were potentially excludable from gross income under section 104(a)(2) of the Internal Revenue Code as "damages received (whether by suit or agreement) on account of personal injuries or sickness,"[3] and that the determination whether the payments represented damages for purposes of section 104(a)(2) is a question of fact that should have been submitted to the jury. This contention is without merit.

■ The essential element of an exclusion under section 104(a)(2) is that the income involved must derive from some sort of tort claim against the payor. The regulations promulgated with respect to section 104(a)(2) specify that "the term 'damages received (whether by suit or agreement)' means an amount received (other than workmen's compensation) through prosecution of a legal suit or action based upon tort or tort type rights, or through a settlement agreement entered into in lieu of such prosecution."[4] The regulation's emphasis on the tortious aspect of the claim is consistent with judicial construction of the section. In applying section 104(a)(2) courts have uniformly assumed that the exclusion applies only to payments resulting from the prosecution or settlement of a tort claim. *See, e. g., Knuckles v. Commissioner of Internal Revenue*, 10 Cir., 1965, 349 F.2d 610; *Starrels v. Commissioner of Internal Revenue*, 9 Cir., 1962, 304 F.2d 574; *Agar v. Commissioner of Internal Revenue*, 2 Cir., 1961, 290 F.2d 283; *Seay v. Commissioner*, 1972, 58 T.C. 32; *Roosevelt v. Commissioner*, 1964, 43 T.C. 77. This interpretation accords with

the underlying purpose of section 104(a)(2). Where damages are paid as compensation for wrongful loss there has been no economic gain or accession to wealth by the taxpayer, but merely a restoration to the position he occupied prior to the loss. He has been made whole, not enriched. *Starrells*, 304 F.2d at 576.

In the instant case, there has been no suggestion, nor it seems could there have been, that the payments to appellant by the laboratories to which she sold plasma were either intended or understood as a settlement of some tort liability. The record contains no indication that the laboratories' actions with respect to Garber were in any sense tortious or that they or she ever believed that a tort claim existed. Undoubtedly appellant suffered pain and discomfort as the necessary and inevitable corollary of the means by which she chose to make her living; the mere presence of pain and discomfort, however, does not give rise to a cause of action in tort. Appellant was fully cognizant of the side effects involved with the sale of her plasma; she negotiated her contracts with this in mind and was significantly remunerated for her troubles.

■ Absent any suggestion that the payments to Garber were in settlement of a possible tort liability, these payments could not as a matter of law fall within the exclusion of section 104(a)(2). There is no disputed issue of fact whose resolution would alter this conclusion. This is not a case where there exists some factual question as to whether payments were intended as a settlement of a tort claim or were made for some other purpose. In such a case, the applicability of section 104(a)(2) would depend on the characterization of the payments. *See, e. g., Knuckles, supra; Agar, supra; Seay, supra.* Where the relevant facts are not in dispute and the decision regarding an issue hinges solely on an

---

**3.** 26 U.S.C. § 104 (1976) reads in pertinent part:
(a) *In general.*—Except in the case of amounts attributable to (and not in excess of) deductions allowed under section 213 (relating to medical, etc., expenses) for any prior taxable year, gross income does not include—

(2) The amount of any damages received (whether by suit or agreement) on account of personal injuries or sickness;

**4.** 26 C.F.R. § 1.104–1(c) (1978).

interpretation of the applicable law, the responsibility for resolving that issue lies uniquely within the province of the court.

 Given the unavailability of an exclusion from income, the compensation received by appellant was clearly gross income under section 61(a) of the Internal Revenue Code.[5] Congress intended this section to encompass all economic gains and accessions to wealth except those excluded by statute. *See, e. g., Helvering v. Clifford,* 309 U.S. 331, 60 S.Ct. 554, 84 L.Ed. 788 (1940); *Commissioner of Internal Revenue v. Glenshaw Glass Co.,* 348 U.S. 426, 75 S.Ct. 473, 99 L.Ed.2d 483 (1955); *James v. United States,* 366 U.S. 213, 81 S.Ct. 1052, 6 L.Ed.2d 246 (1961); *United States v. Gotcher,* 5 Cir., 1968, 401 F.2d 118. The district court, therefore, acted properly in instructing the jury that payments to appellant for her blood plasma represented taxable income.

Appellant's second contention on appeal is that, as a matter of law, she could not have had the requisite intent to evade taxes since two government agencies disagreed as to whether giving blood should be classified as a personal service or as the sale of a product. She relies on *United States v. Critzer,* 4 Cir., 1974, 498 F.2d 1160, in which the conviction of the defendant, an Eastern Cherokee Indian, for tax evasion was reversed due to the great uncertainty in the law concerning the taxability of income from various transactions that took place on the Eastern Cherokee Reservation. In that case, the Bureau of Indian Affairs and the Internal Revenue Service strongly disagreed on the taxability of the income, and the local superintendent of the Bureau had twice advised defendant Critzer that the income was exempt. Under the circumstances the Fourth Circuit concluded that

the defendant could not be guilty of willfully evading and defeating income taxes. 498 F.2d at 1162.

The instant case is quite different from *Critzer.* There is no disagreement between government agencies concerning the taxability of Garber's income, nor has any governmental authority advised her or otherwise led her to believe that income from the sale of her plasma would be exempt from taxation. Throughout this litigation, appellant has placed considerable emphasis on the fact that the IRS has, for certain purposes, classified the donation of blood as a personal service [6] while the Food and Drug Administration has classified blood as a product.[7] This emphasis is misplaced for regardless of whether blood is a personal service or a product, the income derived from its sale would constitute taxable income under section 61(a) of the Code. As to the taxability of such compensation the Government has created no confusion. Hence, we need not decide whether giving blood represents a personal service or the sale of a product. Depending on the circumstances, there are good reasons for treatment as either one.

 There is, therefore, no basis in this case for holding that the law regarding the taxability of the compensation paid appellant was so confused and ambiguous that she could not, as a matter of law, have had the intent willfully to evade her income taxes. The jury concluded on the basis of ample credible evidence that Garber willfully evaded her tax liability for 1972 and there is no valid reason to disturb its verdict.

 Finally, appellant contends that the trial court erred in excluding the testimony of an expert witness concerning the exist-

5. 26 U.S.C. § 61(a) reads in pertinent part:
 Except as otherwise provided in this subtitle gross income means all income from whatever source derived, including (but not limited to) the following items:
 (1) Compensation for services, including fees, commissions, and similar items;
 (2) Gross income derived from business;
 . . . . .

6. See Rev.Rul. 162, 1953–2 C.B. 127–28. In this ruling the IRS decided that the value of

blood donated to a charitable institution was not deductible as a charitable contribution because the donation of blood was characterized as a personal service.

7. FDA regulations dealing with the collection, processing and storage of human blood have treated blood as a product even while it remains in the donor. *See, e. g.,* 40 Fed.Reg. 53,532 (Nov. 18, 1975); 21 C.F.R. parts 606 & 640 (1977).

ence of a tax deficiency due and owing by her to the United States. She argues correctly that in order to secure a conviction for tax evasion under section 7201 the prosecution must establish the existence of a tax liability owed by the defendant. *Sansone v. United States,* 380 U.S. 343, 351, 85 S.Ct. 1004, 1010, 13 L.Ed.2d 882 (1965); *Willingham v. United States,* 5 Cir., 289 F.2d 283, *cert. denied,* 368 U.S. 828, 82 S.Ct. 49, 7 L.Ed.2d 31 (1961); *Koontz v. United States,* 5 Cir., 1960, 277 F.2d 53. The proffered testimony of Daniel W. Nall, a certified public accountant and former IRS employee, was intended to refute the existence of such a tax liability.

■ While a defendant is entitled to present testimony to demonstrate the absence of a tax deficiency, such testimony must be relevant to some issue within the competence of the jury in order to be admissible. As proffered, accountant Nall's testimony consisted entirely of his opinion with regard to the proper interpretation of the law governing the taxability of appellant's income. He stated that, in his view, the sale of a part of the body, including blood, was not a taxable transaction and that, in any event, the law in this area was too vague and ambiguous to permit an accurate determination of the existence of a tax liability. These opinions concerned questions of law that are exclusively the responsibility of the court.

■ As we explained above, the taxability of appellant's income in the circumstances of this case was an issue of law for the court. In our judicial system the court instructs the jury on the applicable law, and directs the jury to determine the facts from the evidence and to apply the law as given by the court to those facts. The law is neither introduced as evidence nor presented through witnesses at trial. *Cooley v. United States,* 9 Cir., 1974, 501 F.2d 1249, *cert. denied,* 419 U.S. 1123, 95 S.Ct. 809, 42 L.Ed.2d 824 (1975); *White v. United States,* 5 Cir., 1954, 216 F.2d 1. To permit a witness to testify in the presence of the jury on the proper interpretation of the law would impermissibly infringe on the function of the court and would risk serious confusion of the jury. Appellant could have adduced testimony at trial relevant to any factual proposition tending to negate the existence of a tax deficiency. She could not, however, present to the jury testimony directed solely to the legal issue of whether the sale of blood is a taxable transaction. The district court, therefore, properly excluded this proffered testimony.[8]

Appellant's conviction is, accordingly,

AFFIRMED.

CHARLES CLARK, Circuit Judge, dissenting:

I fully agree with the majority that the question of taxability of funds received for plasma taken from human blood is novel. I further agree that defendant's voluntary submission to the plasmapheresis process negates any legal construct of the funds as damages received for personal injuries. My problem arises because the court charged the jury that all funds received by the defendant were taxable income. I do not believe the government proved beyond a reasonable doubt that this was legally true.[1]

---

8. We note that, although appellant does not renew this argument on appeal, her counsel stated at trial that Nall's testimony was also designed to show a lack of intent to evade taxes. Since Nall had not informed appellant of his views prior to the filing of the returns in question, his testimony suffered from the same infirmity when proffered for this purpose as it did with regard to the existence of a tax deficiency. As the witness had no direct knowledge of Garber's state of mind, he could only have expressed his opinion that the law itself was confused, leaving the jury to infer that, as a consequence, appellant must also have been confused. As discussed in the text, a witness cannot instruct the jury on the law.

Appellant was, of course, free to present any direct evidence regarding her state of mind and she testified at length concerning her belief that the compensation paid to her did not constitute taxable income.

1. As in all criminal prosecutions, the government has the burden of proving every element of the crime charged beyond a reasonable doubt. *United States v. House,* 524 F.2d 1035 (3d Cir. 1975); *United States v. England,* 347 F.2d 425 (7th Cir. 1965). In a criminal tax evasion prosecution such as this, the government must prove the existence of a tax deficiency, an affirmative act constituting an evasion or attempted evasion of the tax due, and

The government took the position that monies paid to Mrs. Garber were for personal services. Mrs. Garber contended in the alternative that the payments she received were tort damages, or that they came from the sale of a product. Just as we are all convinced Mrs. Garber's tort damages theory is faulty, I am convinced Mrs. Garber was not rendering personal services. She was selling tangible property in the form of a constituent part of her blood. This was as much a product as if Mrs. Garber had sold an eye or one of her kidneys. Taxability depends not on gross receipts but on the seller's net income.[2] The trial court was in error in preventing the development of this theory of defense. The government put on testimony by a tax attorney-law professor that if a sale of a product was involved in Mrs. Garber's plasmapheresis, the taxpayer's basis would be zero. However, this testimony was taken on the contingent basis that it would only be offered if the court admitted the defendant's expert evidence to the effect that in this product sale the basis had to be assumed to be equal to the selling price. Since the court refused to permit defend-

ant's witness to testify, the record is devoid of any proof of defendant's basis in the product she sold.

I am quick to admit I have no idea what basis a taxpayer would have when selling a part of his or her body. It is only necessary to say that the government failed to prove that Mrs. Garber knew what this basis was or that it was substantially below the value she received.[3] Certainly it was not so obvious she had no basis in the property sold that her actions were willfully criminal. The absence of proper proof to establish her base heightens my nonjudicial yet serious doubts as to the wisdom of the government's choice to prosecute Mrs. Garber criminally in this case of first impression. I am sure, however, that I do not want the affirmance of her conviction on my judicial record. I respectfully dissent.

## ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC

Before BROWN, Chief Judge, and COLEMAN, GOLDBERG, AINSWORTH, GODBOLD, CLARK, RONEY, GEE, TJOFLAT,

---

willfulness. *Sansone v. United States*, 380 U.S. 343, 85 S.Ct. 1004, 13 L.Ed.2d 882 (1965); *Lawn v. United States*, 355 U.S. 339, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958); *Holland v. United States*, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1954); *United States v. Goichman*, 547 F.2d 778 (3d Cir. 1976); *United States v. Swallow*, 511 F.2d 514 (10th Cir. 1975); *United States v. Calles*, 482 F.2d 1155 (5th Cir. 1973); *United States v. Stone*, 431 F.2d 1286 (5th Cir. 1970). Unlike a civil assessment for an alleged tax deficiency, the government in a criminal evasion case need not pinpoint the exact amount due. It must only establish beyond a reasonable doubt that a "substantial" amount of tax liability was willfully evaded. *United States v. Miller*, 545 F.2d 1204 (9th Cir. 1976); *United States v. Allen*, 522 F.2d 1229 (6th Cir. 1975); *United States v. Beasley*, 519 F.2d 233 (5th Cir. 1975); *Leeby v. United States*, 192 F.2d 331 (8th Cir. 1951). Nevertheless, the existence of a tax deficiency is an essential element of the offense. *Sansone v. United States, supra; Lawn v. United States, supra; United States v. Bethea*, 537 F.2d 1187 (4th Cir. 1976); *United States v. Baum*, 435 F.2d 1197 (7th Cir. 1970); *United States v. Wilkins*, 385 F.2d 465 (4th Cir. 1967); *United States v. Moody*, 339 F.2d 161 (6th Cir. 1964); *Sherwin v. United States*, 320 F.2d 137 (9th Cir. 1963); *Kowalsky v. United*

*States*, 290 F.2d 161 (5th Cir. 1961); *Willingham v. United States*, 289 F.2d 283 (5th Cir. 1961). *See also, United States v. Horton*, 526 F.2d 884 (5th Cir. 1976); *United States v. Burrell*, 505 F.2d 904 (5th Cir. 1974). Although a willful misstatement of a material fact on an income tax return which does not affect the stated tax liability may be a punishable offense, 26 U.S.C.A. § 7207, such conduct does not amount to willful tax evasion in violation of 26 U.S.C.A. § 7201, the offense charged in this case. *Sansone v. United States, supra; United States v. Coppola*, 425 F.2d 660 (2d Cir. 1969).

2. Taxable gain from the sale of a product is the excess of the selling price over the basis. 26 U.S.C.A. § 1001. Basis is defined in the Internal Revenue Code as "cost." 26 U.S.C.A. § 1012. *See United States v. Catto*, 384 U.S. 102, 86 S.Ct. 1311, 16 L.Ed.2d 398 (1966); *Sunray Oil Co. v. CIR*, 147 F.2d 962 (10th Cir. 1945).

3. *Cf. Raytheon Production Corp. v. CIR*, 144 F.2d 110, 114 (1st Cir. 1944), which noted: "where the cost basis that may be assigned to property has been wholly speculative, the gain has been held to be entirely conjectural and not taxable."

HILL, FAY, RUBIN and VANCE, Circuit Judges.

BY THE COURT:

A member of the Court in active service having requested a poll on the application for rehearing en banc and a majority of the judges in active service having voted in favor of granting a rehearing en banc,

IT IS ORDERED that the cause shall be reheard by the Court en banc on briefs without oral argument. The Clerk shall set a briefing schedule for the filing of supplemental briefs.