WILLIAM A. GLYNN AND FLORENCE E. GLYNN, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4718–77.    Filed January 21, 1981.

William A. Glynn, pro se.
*Thomas P. Dougherty, Jr.*, for the respondent.

NIMS, *Judge*: Respondent determined a deficiency of $12,268.89 in petitioners' Federal income tax for the year 1973. After concessions by petitioners, the issues remaining for decision are: (1) Whether a $25,000 payment to petitioner from the Town of Foxborough, Mass., in settlement of threatened litigation, is excludable from gross income; and (2) whether petitioners properly excluded $6,400 in wages from gross income.

## FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and attached exhibits are incorporated herein by reference.

At the time the petition was filed, the petitioners resided in Foxborough, Mass.

From 1963 through January 30, 1973, petitioner William Glynn (the petitioner) held the position of Superintendent of Schools for the Town of Foxborough, Mass.

In October 1969, the Foxborough School committee (the committee) requested petitioner's resignation as superintendent

since the committee did not agree with the way petitioner was managing the school system. Petitioner believed that a factor motivating this request was his high salary. He felt he had come to be perceived by many as a symbol of the high cost of education.

Petitioner indicated to the committee that he would submit his resignation if he were paid for unused vacation time, professional improvement leave, and sick leave. The committee, however, refused to commit itself to paying petitioner for his unused sick leave and petitioner consequently did not submit his resignation.

Prior to January 1971, petitioner privately informed the committee that he was considering a lawsuit against it and some of its individual members. In January of that year, petitioner made his threats of suit public for the first time.

In September 1972, in a closed-session meeting, the committee repeated its request for petitioner's resignation. Petitioner responded by again threatening suit against the committee and its individual members.

In connection with his threats of legal action, petitioner submitted a document to the committee entitled "Unethical Conduct Charges." The charges accused the committee of, among other things, denying petitioner a vacation time allowance previously granted; denying petitioner sabbatical leave; denying petitioner accumulated benefits; and generally interfering in petitioner's performance of duties as superintendent (specific instances were listed). In addition, the list of charges included the following allegations:

17. That certain members of the Foxborough School Committee did violate ethical conduct by the illegal disclosure of information concerning an executive session meeting.

18. That certain members of the Foxborough School Committee did violate ethical conduct by damaging the professional reputation of the superintendent by this disclosure.

In a letter dated November 27, 1972, to petitioner's lawyer, Jeffrey Freedman, the committee recited the various charges which provided the basis for the committee's proposed dismissal of petitioner. This letter, in specifically referring to petitioner's continued threats of legal action, alleged that such threats tended to destroy the committee's harmonious and cooperative atmosphere and thus constituted conduct unbecoming a superintendent. The committee also cited specific instances of alleged

mismanagement and incompetency, including petitioner's deficiencies in administering and evaluating the Iowa Tests and his supervision of the activities of the business manager, and petitioner's failure to inform the committee as to the existence of a drug problem in the school system. The letter stated that "Each of the charges set forth herein is a separate and adequate cause for said dismissal."

Discussions between petitioner's lawyer and the committee's chairman, Vincent Igo, concerning a settlement of the dispute were conducted between September and December of 1972. In December of that year, Freedman informed petitioner that there appeared to be a basis for settlement as the committee had agreed to pay petitioner for his unused sick leave (in addition to unused vacation time and professional improvement leave). Although petitioner was willing to resign on these terms, they were never ratified by the committee.

In January 1973, after the aborted settlement effort, the committee instituted formal removal hearings based on the charges contained in the November 27 letter to Freedman. After several committee meetings, petitioner and the committee resolved their dispute and signed a settlement agreement dated January 27, 1973.

Petitioner was the principal drafter of this agreement. Pursuant to the settlement, petitioner agreed to drop all charges against committee members and to resign as superintendent, effective January 30, 1973. In addition, petitioner was to remain employed by the school system as a teacher. Finally, the agreement stated that "The committee grants Mr. Glynn the sum of $25,000 as a lump sum payment in lieu of doctoral advantages."

The forsaken "doctoral advantages" essentially referred to the Ph.D. degree which petitioner failed to obtain. During his tenure as superintendent of schools at Foxborough, petitioner was inhibited from pursuing his doctorate because of a heavy work schedule and also, in petitioner's view, because of the committee's alleged denial of sabbatical leave.

The committee members believed that the only basis for petitioner's threatened legal actions were contained in petitioner's unethical conduct charges. At no time did petitioner ever expressly threaten to sue the committee for any injury to his personal reputation or his physical or mental health. During the

period of petitioner's dispute with the committee, no personal slurs were lodged against petitioner, either by the committee en masse or by any of its individual members.

During 1973, the St. Michael's School of Newport, R.I. (St. Michael's), paid $6,400 in wages to petitioner for his services as the school's executive director. Petitioner wanted to donate these wages to St. Michael's in order that the school would be able to construct housing facilities for its executive director or headmaster. During 1973, petitioner placed these wages in a special bank account over which he had exclusive dominion and control. As of the time of the trial of this case, St. Michael's had not been given the use of any of these funds; the $6,400 was at that time in a special account at Merrill, Lynch, Pierce, Fenner & Smith, Inc., and petitioner had exclusive dominion and control over the account.

## OPINION

The first issue for decision involves the question of whether the $25,000 payment which petitioner received pursuant to the settlement agreement with the Foxborough School Committee is includable in gross income. Petitioners argue that this "payment may reasonably be construed as compensation for personal injury rather than damages to professional reputation since the charges brought against him were untrue, insignificant, or frivolous in nature and were presented solely or primarily because petitioner refused to accept the offered settlement which did not include payment for unused sick leave." Although petitioners do not specifically cite section 104(a)(2)[1] in support of their position, that section allows the exclusion from gross income of "the amount of any damages received (whether by suit or agreement) on account of personal injuries or sickness."

The determination of whether a settlement payment is exempt from taxation under section 104(a)(2) depends on the nature of the claim settled and not on the validity of the claim. *Seay v. Commissioner*, 58 T.C. 32 (1972). The essential element of an exclusion under section 104(a)(2) is that the income involved must derive from some sort of tort claim against the payor.

---

[1]All section references are to the Internal Revenue Code of 1954, as amended and in effect during the year in issue, unless otherwise specifically indicated.

*United States v. Garber,* 589 F.2d 843 (5th Cir. 1979); sec. 1.104-(1)(c), Income Tax Regs.

In a case such as this where the settlement agreement lacks express language stating that the payment was made on account of personal injuries, the intent of the payor in making the payment must be discerned. *Knuckles v. Commissioner,* 349 F.2d 610 (10th Cir. 1965), affg. a Memorandum Opinion of this Court. Here, the record indicates that the primary reasons for the dispute between petitioner and the committee were the dissatisfaction by some committee members with petitioner's job performance and petitioner's refusal to resign because the committee would not pay him for his accrued sick leave. In other words, the cause of the controversy centered around the respective contractual rights of the parties.

A perusal of petitioner's unethical conduct charges, which formed the basis for his threatened suit, reveals only one potential tort-like area of the dispute. Paragraph 18 alleges that petitioner's professional, i.e., business, reputation was damaged as a result of a certain disclosure by the committee's members. For reasons discussed herein, we do not believe that the committee's reason for making the settlement payment arose out of this allegation. In any event, payments for injury to professional reputation are not excludable from gross income, since any damages alleged to have been paid as a result of such injury would not fall within the exclusion afforded payments for injuries to *personal* reputation. Rather, they would more properly be characterized as payments made in satisfaction of injuries to petitioner's *business* reputation as compensation for past or future income which might have been or might be lost, and thus, being compensatory by nature, would be taxable as ordinary income. Cf. *C. A. Hawkins v. Commissioner,* 6 B.T.A. 1023 (1927); see *Agar v. Commissioner,* T.C. Memo. 1960-21, affd. on a related issue 290 F.2d 283 (2d Cir. 1961).

Petitioner's efforts to characterize the payment as having been made on account of personal injuries are belied by the record. From the inception of the dispute in question, petitioner's principal concern was with respect to receiving payment for his accrued sick leave. Indeed, he had been willing to resign when he had been informed by his lawyer that the committee had agreed to pay him for such. Petitioner never threatened to sue nor did he ever expressly request the committee to pay him a

cash award based on damages to his personal reputation or his physical or mental health. Although the settlement agreement states that the primary reason for the $25,000 payment was petitioner's forsaken "doctoral advantages" (his failure to obtain a Ph.D. degree because of his heavy work load), such does not diminish the fact that the basis of the controversy was essentially contractual in nature. Any portion of the award attributable to these lost advantages can easily be traced to petitioner's demand that he be paid for accrued educational or sabbatical leave.

Petitioner testified that, as a result of his dispute with the committee, he became physically and mentally ill. It is his position that the payment from the Town of Foxborough was on account of these particular infirmities. However, it should be evident that the consequences of a dispute are not necessarily commensurate with its origin. See *Knuckles v. Commissioner, supra.*[2] Here, no claim for personal injury was ever made. The settlement payment was essentially severance pay and can in no way be said to have arisen from tort-like injuries to petitioner's person, as required under section 104(a)(2). Cf. *Seay v. Commissioner, supra.*

Accordingly, we hold that the $25,000 payment which petitioner received is not excludable from gross income under section 104(a)(2) or for injury to his personal reputation.

The second issue for our decision relates to the $6,400 in wages which petitioner received from the St. Michael's School in 1973. Petitioner testified that during 1973 he decided that he would donate these wages back to St. Michael's in order to provide the school with funds for the purpose of constructing housing for its executive director or headmaster. However, since the school did not have a special fund for this purpose, petitioner placed this money in a special bank account (later a brokerage account) over which he exercised exclusive dominion and control. As of the date of trial, the $6,400 remained in a special account exclusively controlled by petitioner. St. Michael's had never been given any portion of these funds.

It is readily apparent that there was no legal basis for

---

[2]In *Knuckles v. Commissioner*, 349 F.2d 610 (10th Cir. 1965), the fact that the taxpayer became emotionally disturbed during negotiations in settlement of the dispute was held not determinative for purposes of characterizing the settled claim.

petitioner's exclusion of the $6,400 in wages received from St. Michael's. Section 61(a)(1) expressly includes compensation for services within the definition of income.

Further, it is equally evident that petitioners are not entitled to an offsetting charitable deduction under section 170. St. Michael's has never received the funds in question, either actually or constructively. Indeed, petitioner acknowledged at trial that he is uncertain whether he will ever donate the funds to the school. Since full control over the proposed gift was retained by petitioner, no deduction under section 170 is allowable.[3]

*Decision will be entered under Rule 155.*

---

[3]Petitioner does not claim, nor has any proof been adduced, that the corporate custodian of the funds stood in a trustee relationship vis-a-vis the school.