ALBERT F. AND IDA E. WEDVIK, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 21304-84.     Filed December 30, 1986.

*Peter R. Stromer*, for the petitioners.
*Hugh M. Spall*, for the respondent.

GOFFE, *Judge*: The Commissioner determined deficiencies in petitioners' Federal income tax and additions to tax as follows:

| Taxable year | Deficiency | Additions to tax | |
| | | Sec. 6653(b)(1) [1] | Sec. 6653(b)(2) |
|---|---|---|---|
| 1980 | $5,479 | $2,739.50 | 0 |
| 1981 | 6,691 | 3,345.50 | 0 |
| 1982 | 6,796 | 3,398.00 | 50% interest due on $6,796 |

In his answer respondent alleged, as an alternative to the imposition of the additions to tax for fraud, that petitioners are liable for additions to tax under section 6653(a) and for damages under section 6673.

The issues presented are: (1) Whether petitioners are entitled to deduct alleged charitable contributions made to several chartered congregations of the Universal Life Church, Inc., and to a fund maintained by the Universal Life Church, Inc.; (2) whether petitioners are liable for additions to tax under section 6653(b); and (3) if we find that imposing the additions to tax under section 6653(b) is inappropriate, whether petitioners are liable for additions to tax under section 6653(a) and damages under section 6673.

### FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and the attached exhibits are incorporated by this reference.

Albert F. and Ida E. Wedvik (petitioners) resided in Washington State during the taxable years in issue and at the time they filed their petition in this case. Petitioners filed joint Federal income tax returns for the taxable years 1980, 1981, and 1982.

Sometime prior to 1980 petitioners applied for and received Universal Life Church (ULC) charter number 32731 from the Universal Life Church, Inc., of Modesto, California (ULC, INC.). On December 24, 1979, petitioners opened a checking account with Seattle First National Bank in the name of Universal Life Church, Inc., charter number 32731, with a deposit of $11,743.59. Petitioners and Aileen Wedvik,

[1] All section references are to the Internal Revenue Code of 1954 as amended and in effect during the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

whose relationship to petitioners is not known, were the sole signatories of this account. Throughout the taxable years in issue, checks were drawn on this account to pay petitioners' personal expenses including mortgage payments on their home, utilities, magazine subscriptions, the cost of travel to Mexico, and payments made for the "Health and Welfare" of petitioners. Petitioners also maintained a personal checking account at Seattle First National Bank.

During the taxable year 1980, the following friends or acquaintances of petitioners held church charters from ULC, INC.:

| | Charter No. | Name of spouse |
|---|---|---|
| Julius Mink | 30674 | Virginia |
| Edward Mink | 34208 | Sunshine |
| Terence Chapin | 22994 | Lynn |
| Dorothy Brooks | 39029 | Ronald |

During the taxable year 1980, petitioners drew checks on their personal account payable to their church and to various other ULC churches as follows:

| Charter No. | Charter holder | Total value of checks |
|---|---|---|
| 30674 | Julius Mink | $10,260 |
| 22994 | Terence Chapin | 1,350 |
| 34208 | Edward Mink | 2,835 |
| Unidentified charters | | 860 |

During the taxable year 1981, petitioners also drew checks on their personal account payable to the ULC churches controlled by Edward Mink, Julius Mink, and Terence Chapin totaling $650, $1,000, and $400, respectively.

Although these payments were ostensibly made as charitable contributions to the respective ULC churches, a close examination of the bank records reveals that almost every, if not every, dollar paid to these other ULC churches was repaid to petitioners by way of direct or indirect payments from the other ULC charter holders to petitioners' church. In their simplest form, the repayments of alleged charitable contributions made by petitioners are illustrated by the transactions that occurred on June 14, 1980. On that date, petitioners purportedly donated $260 to Universal Life Church charter number 22994 by check drawn on their

personal bank account. Universal Life Church charter number 22994 was issued to Terence Chapin. Lynn Chapin, wife of Terence Chapin, then signed a receipt indicating the $260 donation by petitioners. Contemporaneously, the Chapins drew a check in the amount of $260 from their personal bank account payable to Universal Life Church charter number 32731, which was controlled by petitioners.

Petitioners also engaged in many more complicated check swaps with ULC charter holders. The transactions that occurred in July 1980 are illustrative of the machinations in which petitioners engaged. On July 14, 1980, Julius Mink wrote a check payable to petitioners' ULC church in the amount of $825. On the same day, Edward Mink wrote a check payable to petitioners' ULC church in the amount of $375. With checks dated July 15, 1980, petitioners made payments of $825 and $375 to the ULC churches controlled by Edward Mink and Julius Mink, respectively. Receipts for these payments were issued to petitioners. As a result of these transactions, petitioners drew checks on their personal bank account in the total amount of $1,200, and deposits totaling $1,200 were made in their church bank account. Although it appears that the ULC church controlled by Edward Mink received $450 more than he paid out of his personal account, and Julius Mink $450 less, an inspection of the bank records of Julius Mink's ULC church reveals that, 3 days prior to the above check swaps, Edward Mink paid $450 to Julius Mink's ULC church. The following chart summarizes the above transaction with credits indicating payments from the individuals' personal accounts and debits indicating donations to their respective ULC churches:

| Date | Petitioners | Julius Mink | Edward Mink |
|------|-------------|-------------|-------------|
| 7/11/80 | | $450 | ($450) |
| 7/14/80 | $825 | (825) | |
| 7/14/80 | 375 | | (375) |
| 7/15/80 | (825) | | 825 |
| 7/15/80 | (375) | 375 | |
| | 0 | 0 | 0 |

In early 1981, petitioners ceased exchanging checks with other ULC charter holders and began making regular payments to the Universal Life Church Receipts and Disbursements Trust Fund, a fund established and maintained by personnel connected with ULC, INC. Beginning May 11,

1981, and continuing throughout the taxable years 1981 and 1982, petitioners regularly drew checks on their personal account payable to cash almost always in the amount of $1,000. Donation receipts were then issued and stamped with the signature of Keith L'Hommedieu, an individual associated with ULC, INC., in the amount of $1,000. At the same time a check or checks were drawn on a checking account maintained in the name of Universal Life Church Receipts and Disbursements Trust Fund at the East Santa Cruz branch of Bank of America and made payable to petitioners, their ULC church, or both. These checks, which were also stamped with the signature of Keith L'Hommedieu, invariably totaled an amount just less than $1,000. If more than one check was written to petitioners or their ULC church on the receipts and disbursements trust fund account, such checks would be in sequential order and were written in odd dollar amounts.

The transactions occurring in early June 1981, provide an excellent example of this check swap. On June 1, 1981, petitioners drew a check on their personal checking account to cash in the amount of $1,000. A receipt dated June 3, 1981, and stamped with the signature of Keith L'Hommedieu was issued to petitioners to acknowledge an alleged charitable contribution of $1,000. Simultaneously, three checks, numbers 1857, 1858, and 1859, were drawn on the receipts and disbursements trust fund account and stamped with the signature of Keith L'Hommedieu. Check numbers 1857 and 1858, in the respective amounts of $109.77 and $258.13, were made payable to Albert Wedvik. Check number 1859 in the amount of $628.35 was made payable to Universal Life Church with a memo notation to "32731," petitioners' ULC charter number. This transaction may be summarized as follows:

| Date | Check drawn on petitioners' personal account to cash | ULC receipt amount | Checks drawn on receipts and disbursements trust fund account payable to | |
| --- | --- | --- | --- | --- |
| | | | Petitioners | ULC 2731 |
| 6/1/81 | $1,000 | | | |
| 6/3/81 | | $1,000 | $258.13 | |
| 6/4/81 | | | 109.77 | $628.35 |
| | | | $996.25 | |

The following table lists the dates and the amounts of the ULC receipts stamped with the signature of Keith L'Hommedieu, along with the amounts of checks drawn on petitioners' personal checking account payable to cash, and the amounts of checks drawn on the receipts and disbursements trust fund account made payable to petitioners, their church, or both:

| ULC receipts | | Checks drawn on petitioners' account | Checks drawn on receipts and disbursements trust fund account payable to: | | |
|---|---|---|---|---|---|
| Date | Amount | Amount | Petitioners | Church | Total |
| *1981* | | | | | |
| May 14 | $1,000 | $1,000 | - - - | $976.58 | $976.58 |
| May 21 | 1,000 | 1,000 | - - - | 998.75 | 998.75 |
| June 3 | 1,000 | 1,000 | [1]$367.90(2) | 628.35 | 996.25 |
| Sept. 3 | 1,000 | 1,000 | 213.00 | 784.50 | 997.50 |
| Sept. 14 | 1,000 | 1,000 | 769.68(2) | 226.57 | 996.25 |
| Sept. 25 | 1,000 | 1,000 | 464.80(2) | 531.45 | 996.25 |
| Oct. 6 | 1,000 | - - - | 478.87(2) | 507.13 | 986.00 |
| Oct. 16 | 1,000 | 1,000 | 355.15(2) | 641.10 | 996.25 |
| Oct. 30 | 1,000 | - - - | - - - | 998.75 | 998.75 |
| Nov. 13 | 1,000 | 1,000 | 357.77(2) | 638.48 | 996.25 |
| Nov. 20 | 1,000 | - - - | - - - | 998.75 | 998.75 |
| Dec. 4 | 1,000 | - - - | 588.17(2) | 408.08 | 996.25 |
| Dec. 11 | 1,000 | 1,000 | 57.60 | 939.90 | 997.50 |
| Dec. 18 | 1,000 | 1,000 | - - - | 998.75 | 998.75 |
| Dec. 29 | 1,000 | 700 | - - - | 998.75 | 998.75 |
| Dec. 30 | 1,000 | - - - | - - - | 998.75 | 998.75 |
| *1982* | | | | | |
| Feb. 16 | 1,000 | 1,000 | 541.94(2) | - - - | 541.94 |
| Feb. 25 | 1,000 | 1,000 | 530.54(2) | - - - | 530.54 |
| Mar. 16 | 1,000 | 1,000 | 627.46(2) | - - - | 627.46 |
| Apr. 12 | 1,000 | 1,000 | 214.58 | - - - | 214.58 |
| May 3 | 1,000 | 1,000 | 622.88 | - - - | 622.88 |
| May 21 | 1,000 | - - - | 552.74(2) | 443.51 | 996.25 |
| June 9 | 1,000 | - - - | 431.17(2) | 565.08 | 996.25 |
| June 22 | 1,000 | - - - | - - - | 998.75 | 998.75 |
| July 9 | 1,000 | 1,000 | 733.45(2) | 262.80 | 996.25 |
| July 30 | 1,000 | 1,000 | 289.11 | 708.39 | 997.50 |
| Aug. 11 | 1,000 | - - - | 296.61(2) | 697.39 | 994.00 |
| Sept. 30 | 1,000 | 1,000 | 973.82(2) | 20.18 | 994.00 |
| Oct. 18 | 1,000 | - - - | 983.61 | 12.39 | 996.00 |
| Oct. 27 | 1,000 | 1,000 | - - - | - - - | - - - |
| Nov. 1 | 1,000 | - - - | 839.80(2) | 154.20 | 994.00 |
| Nov. 19 | 1,000 | 1,000 | 207.38(2) | 786.62 | 994.00 |
| Dec. 6 | 1,000 | 750 | 885.65(2) | 108.35 | 994.00 |
| Dec. 16 | 1,000 | 600 | 125.52(2) | 868.48 | 994.00 |
| Dec. 29 | 1,000 | - - - | - - - | - - - | - - - |
| Dec. 31 | 1,000 | - - - | - - - | - - - | - - - |

[1]The numbers enclosed in parentheses indicate the number of checks, if more than one, the amounts of which were summed to arrive at the figure given in the table.

On March 24, 1980, petitioner Albert F. Wedvik completed a Form W-4, Employees' Withholding Allowance Certificate, upon which he claimed nine withholding exemptions.

On their joint Federal income tax returns, petitioners claimed charitable deductions for contributions to the Universal Life Church in the amounts of $17,455, $18,090, and $19,010 for the taxable years 1980, 1981, and 1982, respectively. In his statutory notice of deficiency mailed on April 4, 1984, the Commissioner disallowed the deductions claimed for contributions to churches controlled by petitioners, other individuals, and to the fund established and administered by persons associated with ULC, INC. The notice of deficiency did not disallow contributions claimed by petitioners for the taxable years in issue in the amounts of $40, $110, and $150.

During the audit of petitioners' Federal income tax returns commenced in 1983, the revenue agent assigned to the audit issued a written request that petitioners produce documentation substantiating the claimed charitable contributions including receipts and canceled checks. Petitioners supplied only receipts signed by those individuals who controlled ULC churches with which petitioners had exchanged checks as well as those stamped with the signature of Keith L'Hommedieu. Petitioners did not produce any copies of canceled checks.

Subsequently, the revenue agent issued an administrative summons to Seattle First National Bank requiring the production of all bank records for the years 1980 through 1982 relating to all accounts in the name of or under the signatory control of petitioners. On November 10, 1983, petitioners filed a petition to quash this summons in U.S. District Court for the Western District of Washington. The petition was denied by the District Court and the summoned records were produced.

## OPINION

In this case, petitioners present more tiresome claims to deductions for alleged contributions to the Universal Life Church. Like the many preceding cases, petitioners' claims do not even pass the smell test. However, this case is made more malodorous because of the taint of fraud occasioned by petitioners' various check-swapping schemes.

Petitioners claim that they are entitled to deduct the payments made to various churches chartered by ULC, INC., including their own, and to a fund established and maintained by personnel associated with ULC, INC. Deductions for charitable contributions are authorized by section 170, provided the contributions are made to or for the use of (1) a corporation, trust, or community chest, fund, or foundation, (2) organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, and (3) no part of the net earning thereof inures to the benefit of any private shareholder or individual. Sec. 170(c)(2). Section 170 also provides that a deduction is allowable only for charitable contributions where the payment thereof is made within the taxable year. Sec. 170(a). To show that payment of the claimed contribution was made during the taxable year, the taxpayer must show that he departed with dominion and control over the alleged gift. Davis v. Commissioner, 81 T.C. 806, 817 (1983), affd. without published opinion 767 F.2d 931 (9th Cir. 1985); Glynn v. Commissioner, 76 T.C. 116, 121-122 (1981), affd. without published opinion 676 F.2d 682 (lst Cir. 1982).[2] Furthermore, no deduction will be allowed where the taxpayer expects some economic benefit in return for the alleged gift. *Sims v. Commissioner*, 72 T.C. 996, 1008-1009 (1979); *Rusoff v. Commissioner*, 65 T.C. 459, 469 (1975), affd. without published opinion 556 F.2d 559 (2d Cir. 1977); *DeJong v. Commissioner*, 36 T.C. 896, 899 (1961), affd. 309 F.2d 373 (9th Cir. 1962). The burden of proving entitlement to a charitable deduction is on petitioners. *Deputy v. duPont*, 308 U.S. 488 (1940); *New Colonial Ice Co. v. Helvering*, 292 U.S. 435 (1934); Rule 142(a).

Based upon our review of the record, we conclude that petitioners have fallen woefully short of satisfying their

---

[2]See *Odd v. Commissioner*, T.C. Memo. 1984-180.

burden of proof. Petitioners systematically met with individuals who controlled churches chartered by ULC, INC., and exchanged checks purporting to be contributions to each respective church. Petitioners drew checks on their personal checking account payable to the ULC churches controlled by Julius Mink, Edward Mink, Terence Chapin, and Dorothy Brooks. At the same time, the alleged contributions were repaid to petitioners by payments to their ULC church by Julius Mink, Edward Mink, Terence Chapin, and Dorothy Brooks. Sometimes the repayment was direct; at other times, the repayment was effected by multiple check swaps which served to disguise the repayment.

Beginning in 1981, petitioners began making payments to the Universal Life Church Receipts and Disbursements Trust Fund, a fund established and maintained by personnel associated with ULC, INC. Petitioners received receipts indicating that they had made a charitable contribution to the Universal Life Church. Simultaneously, a check or checks were drawn on the receipts and disbursements trust fund bank account made payable to petitioners, their ULC church, or both. These repayments invariably totaled slightly less than the payments made by petitioners. For example, on or about June 1, 1981, petitioners drew a check on their personal account payable to cash in the amount of $1,000. Petitioners then likely mailed the $1,000 in cash or a money order to Keith L'Hommedieu of ULC, INC., who then issued a receipt in the amount of $1,000 dated June 3, 1981. In addition, L'Hommedieu issued three checks on the receipts and disbursements trust fund bank account payable to petitioners and their ULC church in amounts totaling $996.25.

Petitioners did not offer any plausible explanation for the repayments of their alleged charitable contributions. In his testimony, petitioner Albert Wedvik simply stated that he did not know that petitioners' contributions to the various other ULC churches and to the receipts and disbursements trust fund would be repaid.[3] We find his testimony to be completely incredible. The long-standing pattern of repayment compels the conclusion that petitioners simply had to

---

[3]Petitioner Ida E. Wedvik did not testify and the parties stipulated that her testimony would be the same as her husband in all essential particulars.

have agreed with the other ULC charter holders and Keith L'Hommedieu, in advance, that all contributions would be repaid.

We give little weight to the fact that a few of the check swaps with other ULC charter holders appear not to have been complete wash transactions. We quite readily attribute small differences occasionally appearing in the amounts of the checks given and received (e.g., $25) to the exchange of cash between the parties.

We also acknowledge that, on occasion, petitioners' bank records do not reflect that any check was drawn on their personal account, or that a check in an amount less than $1,000 was written, prior to the issuance of a receipt and checks by the receipts and disbursements trust fund. However, petitioners readily could have made these payments with cash from other sources. Cash transactions could not, of course, be easily traced through petitioners' bank records. Similarly, in early 1982, repayments from the receipts and disbursements trust fund appear to be far less than the typical amount. Again additional repayments could have been made in cash by L'Hommedieu to bring the total to approximately $1,000.

We point out that frequently the difference between the $1,000 alleged contributions made by petitioners and the repayments are only small amounts, which look suspiciously like service charges for each check written by L'Hommedieu. For example, in the transactions of early June 1981, petitioners received repayments in three separate checks totaling $996.25. The shortfall of $3.75 apparently represents a service charge of $1.25 per check. A review of the chart reproduced earlier suggests that this service charge was increased to $2 per check in August 1982.

Because we find that petitioners did not relinquish dominion and control over their alleged charitable contributions (*Davis v. Commissioner, supra, Glynn v. Commissioner, supra*), and that petitioners expected and received a substantial quid pro quo for the alleged contributions (*Sims v. Commissioner, supra*), we conclude that they did not make any contributions. As a result, we need not consider whether the payments were made to charitable organiza-

tions under section 170(c)(2) except to the extent petitioners made payments directly to their ULC church.

Petitioners have not demonstrated that their church was a corporation, trust, or community chest, fund, or foundation. Sec. 170(c)(2)(A). Likewise, petitioners have not demonstrated that their church was organized for an exempt purpose. Sec. 170(c)(2)(B). Petitioners did not introduce any evidence, such as articles of incorporation, trust documents, or other legal governance documents, that would indicate that the purposes of the church were limited to exclusively exempt purposes. Lastly, petitioners have not demonstrated that the net income of their church did not inure to the benefit of themselves or any other private individual. Sec. 170(c)(2)(C). In fact, we find that there was substantial personal inurement inasmuch as checks were drawn on the church account to pay petitioners' monthly mortgage payments as well as the costs of utilities, magazine subscriptions, a trip to Mexico, and payments for the "Health and Welfare" of petitioners. In sum, the payments made by petitioners to their church are not deductible charitable contributions for the same reasons given in the many Universal Life Church cases that have preceded this one.[4]

We must now decide whether petitioners are liable for additions to tax for fraud under section 6653(b). Under section 6653(b), respondent has the burden of proving by clear and convincing evidence that at least part of an underpayment of tax for the taxable years in issue was due to petitioners' fraud with intent to evade tax. Sec. 7454(a); Rule 142(b); *Doncaster v. Commissioner*, 77 T.C. 334 (1981); *Marcus v. Commissioner*, 70 T.C. 562 (1978), affd. without published opinion 621 F.2d 439 (5th Cir. 1980). This burden is met if it is shown that the taxpayer intended to evade taxes known to be owing by conduct intended to conceal,

---

[4]No good purpose would be served by listing the multitude of cases wherein this Court has rejected claimed deductions for contributions to churches chartered by the Universal Life Church. However, the following is a partial listing of the numerous ULC cases:

*Bell v. Commissioner*, 85 T.C. 436 (1985); *Roben v. Commissioner*, T.C. Memo. 1986-48; *Grew v. Commissioner*, T.C. Memo. 1986-47; *Van Cleve v. Commissioner*, T.C. Memo. 1985-546; *Botwinick v. Commissioner*, T.C. Memo. 1985-501; *Kalgaard v. Commissioner*, T.C. Memo. 1984-283, affd. 764 F.2d 1322 (9th Cir. 1985). See also *Rager v. Commissioner*, 775 F.2d 1081 (9th Cir. 1985), affg. an unpublished order of this Court; *Larsen v. Commissioner*, 765 F.2d 939 (9th Cir. 1985), affg. an order of dismissal of this Court (sanctions imposed for frivolous appeal).

mislead, or otherwise prevent the collection of taxes, and that there is an underpayment of tax. *Stoltzfus v. United States*, 398 F.2d 1002, 1004 (3d Cir. 1968), cert. denied 393 U.S. 1020 (1969); *Rowlee v. Commissioner*, 80 T.C. 1111, 1123 (1983). Fraud will never be presumed. *Beaver v. Commissioner*, 55 T.C. 85, 92 (1970). However, because direct proof of an intent to defraud is seldom possible, respondent may show fraud by circumstantial evidence. *Stephenson v. Commissioner*, 79 T.C. 995, 1005-1006 (1982), affd. 748 F.2d 331 (6th Cir. 1984). The existence of fraud is a question of fact to be resolved upon consideration of the entire record. *Rowlee v. Commissioner, supra* at 1123. Upon consideration of the entire record, we conclude that respondent has sustained his burden of proof by clear and convincing evidence for each of the taxable years in issue.

During the taxable years in issue, petitioners made payments to various ULC chartered churches and to a fund established and maintained by personnel connected with ULC, INC. Petitioners reported these payments on their Federal income tax returns as deductible charitable contributions. However, the record reveals that these payments were made with the understanding that they would be immediately repaid to petitioners either directly or through their ULC chartered church. Despite their protestations that they did not know that the payments would be returned, we believe petitioners knew they were not making contributions of any sort. The check swapping scheme, employed with varying degrees of complexity, is compelling circumstantial evidence that petitioners knew they were not entitled to charitable contribution deductions. The plan to exchange funds with other ULC churches and with the receipts and disbursements trust fund could only have been implemented in an attempt to mislead the IRS to believe that legitimate contributions were made. Because both petitioners participated in these schemes, we uphold the determination of the Commissioner with respect to fraud as to both. Cf. *Fowler v. Commissioner*, T.C. Memo. 1984-311.

Although we find that the elaborate check-swapping schemes employed by petitioners provide sufficient evidence to carry respondent's burden of proof, there are other indicia of fraud that merit mention. We point out that petitioner Albert Wedvik filed a Form W-4 on which he

claimed seven additional withholding exemptions over the personal exemptions allowable for him and his wife. In light of the fact that he had to know that he made no charitable contributions that would significantly reduce his taxable income, filing a false Form W-4 is an indication of fraud. *Habersham-Bey v. Commissioner*, 78 T.C. 304, 313 (1982). Furthermore, despite claiming nine withholding exemptions, petitioners continued to receive large tax refunds in the taxable years in issue. This fact takes on added significance when we consider that if petitioner Albert Wedvik had claimed 10 or more withholding exemptions, thereby reducing the amount of tax withheld from his wages, his employer would have been required to report such fact to the IRS. Sec. 31.3402(f)(2)-1(g)(1)(i), Employment Tax Regs. (prior to amendment by T.D. 7803 (January 21, 1982)). Clearly, petitioners did not want to invite such scrutiny from the IRS.

Lastly, we point out that petitioners refused to produce the bank records requested by the revenue agent. Subsequently, petitioners filed a petition to quash a summons that had been served on the bank where petitioners maintained their personal and church checking accounts. The petition to quash asserted, among other things, that the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97-248, 96 Stat. 324, was unconstitutionally enacted. Inasmuch as these bank records were essential to the discovery of the check-swapping schemes, we think that the refusal to produce those records, along with the unsuccessful attempt to quash the summons of those records, reasonably leads to the conclusion that these were further efforts to conceal the fact that petitioners were not entitled to the claimed charitable contribution deductions.

Because we uphold the determination of the Commissioner with respect to additions to tax for fraud under section 6653(b), we need not consider respondent's alternative allegation that petitioners are liable for additions to tax under section 6653(a), and for damages under section 6673.

Based upon the foregoing,

*Decision will be entered for the respondent.*