L. WINSTON WALLER AND FANNIE M. WALLER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Waller v. Commissioner
Docket No. 17834-88
United States Tax Court
T.C. Memo 1991-183; 1991 Tax Ct. Memo LEXIS 210; 61 T.C.M. (CCH) 2486; T.C.M. (RIA) 91183; April 25, 1991, Filed *210 Decision will be entered under Rule 155. Eugene G. Sayre, for the petitioners. Rebecca A. Dance, for the respondent. PARR, Judge. PARR
MEMORANDUM FINDINGS OF FACT AND OPINION By statutory notice of deficiency dated April 11, 1988, respondent determined deficiencies in and additions to petitioners' joint Federal income taxes as follows: Additions to tax
Sections
Year ending
Deficiency
6653(b) [1]
6653(b)(1)
6653(b)(2)
6661(a)
December 31, 1981
$ 142,472
$ 71,236
- -  - -
- -  December 31, 1982
44,963
- - 22,482
* $ 11,241
Respondent alternatively determined that petitioners were liable for the addition to tax under section 6653(a)(1) and (2) for negligence. *211 Respondent also determined that petitioners were liable under section 1401(a) for self-employment taxes of $ 2,762 and $ 3,029 for 1981 and 1982, respectively. After concessions, the issues for decision are (1) whether petitioners understated their gross income in 1981 and 1982 by the amounts respondent determined; (2)(a) whether petitioners are liable for the addition to tax for fraud for the years in issue, or alternatively, (b) whether petitioners are liable for the addition to tax for negligence; (3) whether the statute of limitations bars respondent from assessing the deficiencies; and (4) whether petitioners are liable for the addition to tax under section 6661. FINDINGS OF FACT Some of the facts have been stipulated. The stipulations of fact and accompanying exhibits are incorporated herein by this reference. Petitioners resided in Emerson, Arkansas, when they timely filed their petition in this case. PETITIONERS' BACKGROUND Petitioner Winston L. Waller (Mr. Waller) was born in Emerson, Arkansas, and attended school there until the fifth grade when he quit to work and help support his family. Although he is intelligent and industrious, Mr. Waller cannot read. While *212 he is able to sign his name, Mr. Waller usually has to have someone else prepare his checks because he cannot spell. After leaving school Mr. Waller worked on a farm. He has also worked in oil fields, a sawmill, and has cut and hauled pulp wood. In 1961, Mr. Waller began his own pulp wood business in which he purchased timber rights from landowners, and employed workers to cut and haul the timber to a local paper mill. His employees met at petitioners' house each morning before departing for the woods. He provided the saws, trucks, tractors, and other equipment, and also labored. His usual work day began at 7:00 a.m., and ended at 5:00 p.m., depending on the number of truckloads of wood gathered during the day, and the progress by late afternoon toward completing other truckloads. Petitioner Fannie M. Waller (Mrs. Waller) finished high school and is able to read and write. Mrs. Waller assisted Mr. Waller in his pulp wood business by recording his expenses in a ledger and preparing quarterly employee payroll tax returns. Her bookkeeping education, however, is limited to one class taken in high school. Mrs. Waller began working as a line worker in a local glove factory in *213 the 1970's, and was later promoted to supervisor of the evening shift. Toward the end of the 1970's, Mr. Waller cut and hauled pulp wood part of the time and worked in "construction" part of the time. He eventually formed his own "construction" business, [2] which initially consisted of clearing and mowing a railroad company's right of way. The railroad foreman became disenchanted with the previous contractor and offered Mr. Waller additional work if he obtained a bulldozer. Mr. Waller purchased a bulldozer and performed contract work for the railroad. The railroad foreman and the previous contractor later settled their differences, and Mr. Waller received less work from the railroad. Mr. Waller meanwhile obtained subcontract work at two local plant construction sites, and eventually replaced those contractors. *214 As he became more involved in the construction business, Mr. Waller purchased additional equipment. He prefers to purchase, rather than finance, equipment to prevent its repossession in times of financial hardship. The only piece of equipment Mr. Waller financed was a piece of heavy equipment he refers to as an "iron mule." The iron mule allows one person to load logs on a truck, and more generally, move logs around. Mr. Waller sold his iron mule and repaid the remaining loan balance on June 6, 1979. The sale of the iron mule marked the end of Mr. Waller's pulp wood business and the beginning of his construction business. In September 1980, petitioners purchased a grocery store building for $ 32,000. Mr. Waller intended to use the building, rather than petitioners' residence, as a meeting place for assigning his employees. Petitioners' daughter operated a grocery business in the building. The grocery store was open from 6:00 a.m. to approximately 8:00 p.m., seven days a week. In 1982, Mr. Waller's father died and one of Mr. Waller's sisters came from Florida to attend the funeral. She wanted to stay and operate a motel she had noticed for sale in Haynesville, Louisiana, *215 10 miles south of Emerson, Arkansas. Mr. Waller paid the initial $ 20,000 downpayment to purchase the motel. The deed to the motel was issued in the name of Mr. Waller and his sister. In May 1983, after the end of the first year's operations, Mr. Waller paid the second installment of $ 21,600, and his daughter took over operating the motel. Mr. Waller's sister moved back to Florida. Mrs. Waller quit her job at the glove factory and operated the grocery store. PETITIONERS' BOOKS AND RETURNS Mr. Waller maintained separate bank accounts and separate books for the grocery business and the construction business. In addition to operating the grocery store, petitioners' daughter also kept their books for the two years in issue. She kept the grocery store records using the same system as the prior owner of the grocery store, and the construction records in the same manner as Mrs. Waller had done in the past. Petitioners' daughter prepared the summary sheets from the books she kept which were used to prepare petitioners' income tax returns for the years in issue. She omitted income totalling $ 42,017.50 received from one construction business source when preparing the 1982 summary *216 sheets. The income tax returns for these two years were prepared by a paid income tax return preparer. Petitioners filed their joint individual Federal income tax returns for taxable years 1981 and 1982, on or before April 15, 1982, and April 15, 1983, respectively, with the Internal Revenue Service Center, Austin, Texas. Their returns for 1981 and 1982 reflected the following. 1981
1982
Income or
Form
Income or
Form
Other   1040
Other   1040
Schedule Schedule Wages
$ 17,530 $ 8,617 Interest income
10,775 Interest exclusion
(400)
Total interest
10,375 14,890 Construction Co. income
$ 264,822 $ 78,457 Construction Co. total
expenses
254,973 93,896 Construction Co. total
9,849
(15,439)
Grocery Store income
$ 84,190 $ 66,127 Grocery Store total expenses
(109,791)
(93,748)
Grocery Store total
(25,601)
(27,621)
Rents & Royalties
1,869 1,900 Depletion
(308)
1,561 (331)
1,569 Unemployment Compensation
- -
4,392 - - Other Income
- -
259 Adjusted Gross Income
$ 13,714 $ (17,725)
RESPONDENT'S EXAMINATION In September 1983, Revenue Agent Nancy Astin sent a standard *217 examination letter requesting petitioners meet with her and bring their original source documents, invoices, receipts, ledgers, journals, cancelled checks, and bank records. Mr. Waller appeared at the meeting by himself. The books and records Mr. Waller brought to the first meeting with Agent Astin were unorganized, and they spent the majority of time in the first meeting sorting records. Mr. Waller did not have all of the requested books and records with him but was in the process of locating them. He informed Agent Astin that his daughter assisted in the bookkeeping responsibilities, and that he wanted her present at the second meeting they scheduled. Mr. Waller was also supposed to bring the unlocated records to the second meeting. After the second meeting, Agent Astin extended the audit to cover petitioners' 1982 tax year because petitioners' records were incomplete and deemed unreliable. By this time, there was not enough time to examine petitioner's 1980 return before the period of limitations expired. Agent Astin met with Mr. Waller several times during the course of the examination. Mr. Waller never failed to keep a scheduled appointment. When Agent Astin questioned *218 Mr. Waller in these meetings about income from his records, he was often hesitant in answering her questions. Agent Astin reviewed the grocery store records and found them to be relatively accurate. She could trace the amounts shown in the books to the tax return. Even after several requests by Agent Astin, however, all of the construction company records were not located and produced. During 1983 and 1984, Agent Astin asked Mr. Waller to supply all of his banking records. Although he requested his bank records three or four times, and supplied bank records to the IRS three or four times, Mr. Waller never provided information on one account he closed in August, 1981. In August 1984, Agent Astin referred the case to the Criminal Investigation Division, and the case was assigned to Special Agent Lorenzo Jones. Special Agent Jones began his examination by trying to identify specific sources of income. However, he resorted to the net worth method because, in his opinion, there were too many income sources to build a case based upon specific items, and the witnesses needed to prosecute a criminal case were uncooperative, deceased, or had moved away. Special Agent Jones interviewed *219 Mr. Waller to determine petitioners' assets and liabilities. He also inspected depreciation schedules in all available tax returns, searched courthouse records in four counties, and searched motor vehicle records for petitioners' assets. After compiling an asset list and net worth schedule, he discussed every asset listed on the net worth schedule with Mr. Waller for correctness and completeness. Agent Astin adopted, with modifications, Special Agent Jones' net worth computation in determining petitioners' deficiency. The stipulated net worth computation reflecting respondent's concessions is as follows: NET WORTH COMPUTATION
ASSETS
1980
1981
1982
1. Bank Accounts and
Certificates of Deposit
$ 177,868.76
$ 304,237.88
$ 387,925.57
2. Real Estate
58,400.00
59,400.00
59,400.00
3. Vehicles
32,900.00
44,399.00
56,549.00
4. Grocery Equip. (additional)
0.00
4,590.00
7,890.00
5. Equipment (non contested)
75,505.00
120,005.00
120,005.00
Contested Items
6. Cash on hand
100.00
100.00
100.00
7. Merchandise inventory
0.00
4,200.00
20,000.00
8. Grocery Store
32,000.00
32,000.00
32,000.00
9. Grocery Equip. (combined)
0.00
3,745.00
3,745.00
10. (2) John Deere Backhoes
0.00
20,000.00
20,000.00
11. (2) Ford 4100 Tractors
0.00
15,845.00
15,845.00
12. Motel Land & Building
0.00
0.00
120,000.00
13. Motel Furn. & Fixtures
0.00
0.00
12,600.00
14. Restaurant Equipment
0.00
0.00
12,992.70
15. Total Assets
$ 376,773.76
$ 608,521.88
$ 869,052.27
16. Accumulated depreciation
45,520.00
70,893.00
105,039.00
17. Net Assets
$ 331,253.76
$ 537,628.88
$ 764,013.27
LIABILITIES
18. Motel Debt
0.00
0.00
$ 123,823.43
19. Net Worth
$ 331,253.76
$ 537,628.88
$ 640,189.84
20. Prior net worth
331,253.76
537,628.88
21. Increase in net worth
$ 206,375.12
$ 102,560.96
Add:
22. Gifts to Children
7,675.00
7,600.00
23. Personal Living Expenses
8,206.00
8,206.00
$ 222,256.12
$ 118,366.96
Less: 24. Nontaxable income
3,883.67
4,837.58
25. Interest exclusion
400.00
0.00
26. Marriage tax exclusion
0.00
430.84
27. Adjusted Gross Income
$ 217,972.45
$ 113,098.54
*220 In August 1981, Mr. Waller paid $ 20,000 cash and traded in a 1977 John Deere 450 bulldozer, and a 1977 John Deere 310 backhoe, for the two John Deere backhoes shown above at line 10. In October 1981, Mr. Waller paid $ 15,845 cash and traded in two Massey Furgeson tractors for two Ford 4100 tractors and two mowers shown above as "(2) Ford 4100 tractors" at line 11. Special Agent Jones made notations in his report that petitioners traded in equipment; however, petitioners failed to document or substantiate their adjusted basis in that equipment to Special Agent Jones. Jones gave petitioners' credit only for their cash outlay, assuming that all of the equipment was fully depreciated. In 1981, petitioners omitted $ 1,967.02 from the sale of cattle Mr. Waller kept as a hobby. In 1982, petitioners omitted $ 42,017.50 construction company revenues received from a single customer, $ 4,305.14 from the sale of timber, and $ 2,575.41 from the sale of cattle. OPINION 1. UNREPORTED INCOME It is well settled that the Commissioner may properly utilize the net worth method even though the taxpayer's books are not inadequate, or on their face appear adequate. Holland v. United States, 348 U.S. 121, 99 L. Ed. 150, 75 S. Ct. 127 (1954); *221 Schwarzkopf v. Commissioner, 246 F.2d 731, 733 (3d Cir. 1957), affg. a Memorandum Opinion of this Court; Hargis v. Godwin, 221 F.2d 486, 491 (8th Cir. 1955). Respondent's deficiency determination is presumptively correct and petitioners bear the burden of proving otherwise. Welch v. Helvering, 290 U.S. 111, 78 L. Ed. 212, 54 S. Ct. 8 (1933); Rule 142(a). Petitioners assail the accuracy of respondent's net worth computation by showing errors and omissions in respondent's schedule. However, the errors and omissions petitioners cite either do not affect respondent's net income determination, or they affect net income, but petitioners have not proven the amount by which their income should be adjusted. Petitioners first contest the amount of cash on hand. Mr. Waller and his daughter testified that they kept up to $ 3,000 at the store for cashing payroll checks, and petitioners argue the balance of cash on hand each year should be $ 3,100. Assuming, arguendo, they had $ 3,100, instead of $ 100, at the end of each year, the constant amount in each year will not affect the income determined. The second contested item is the merchandise inventory on *222 hand at the end of 1980. Petitioners began operating their grocery store in September 1980. According to the grocery store books, they made grocery purchases of $ 20,177.91, and had grocery sales receipts, including sales tax, of $ 16,888.29. Petitioners cite an undated, unsigned notation in the front of the 1980 book that ending inventory was "around $ 8,000.00". There is nothing in the record to suggest that petitioners priced inventory by a specific mark-up on cost, or that an inventory count was taken for any items other than 77 cartons of cigarettes on hand. It is clear petitioners had some inventory in the store on December 31, 1980, however, they have failed to supply the information necessary for us to arrive at a principled determination of the amount. Petitioners argue further that the grocery store was purchased by a single $ 32,000.00 check, and that Agent Astin allocated part of the grocery store purchase price to the equipment purchased with the store in her depreciation schedule. Thus, petitioners argue, it is inappropriate to add another $ 3,745 for the equipment purchased with the building. The $ 3,745 equipment basis total includes a meat slicer purchased *223 on September 10, 1981. We are not able to identify the equipment purchased with the store building from the record before us. Respondent's depreciation schedule has not been introduced into evidence. In short, we are not persuaded that the grocery store and grocery equipment totals should be adjusted. Petitioners argue they should be given credit in the net worth schedule for the adjusted basis of equipment traded in on the backhoes and tractors they acquired in 1981. However, they have not submitted any credible evidence explaining the amount by which their adjusted basis in the equipment should be increased. Petitioners contend that the motel, associated assets, and liabilities should be removed from the schedule and replaced with a $ 20,000.00 loan to Mr. Waller's sister. The net difference in the motel assets and motel liabilities ($ 21,769.27) at the end of 1982, exactly equals the amount of the alleged loan ($ 20,000.00) to Mr. Waller's sister, and the principal reduction ($ 1,769.27) of the mortgage balance. Thus, it makes no difference whether the motel or a loan to Mr. Waller's sister is reflected on the schedule. Petitioners' final contention is that accounts receivable *224 as of December 31, 1980, have been omitted from the net worth computation. Petitioners' income was determined on the cash basis, and income is taxable to petitioners the earlier of actual or constructive receipt. Sec. 451; Sec. 1.451-1(a), Income Tax Regs. Petitioners have failed to show that any income received in 1981, attributable to work performed in 1980, was included in petitioners' 1980 income tax return. In summary, the errors and omissions petitioners cite do not render respondent's computation unreliable. Based on the foregoing, we sustain respondent's net worth computation. 2(a). FRAUD Fraud is defined as an intentional wrongdoing designed to evade a tax believed to be owing. Powell v. Granquist, 252 F.2d 56 (9th Cir. 1958); Mitchell v. Commissioner, 118 F.2d 308 (5th Cir. 1941); Petzoldt v. Commissioner, 92 T.C. 661, 698 (1989). Respondent has the burden to prove fraud by clear and convincing evidence. Sec. 7454(a); Rule 142(b). To meet this burden, respondent must show that there is some underpayment of tax and that petitioner engaged in conduct intended to conceal, mislead, or otherwise prevent the *225 collection of taxes known to be owing. Stoltzfus v. United States, 398 F.2d 1002, 1004 (3d Cir. 1968); Wedvik v. Commissioner, 87 T.C. 1458, 1468-1469 (1986); Rowlee v. Commissioner, 80 T.C. 1111 (1983). The existence of fraud is a question of fact to be resolved upon consideration of the entire record. Estate of Pittard v. Commissioner, 69 T.C. 391 (1977); Gajewski v. Commissioner, 67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Fraud may be proven by circumstantial evidence because direct proof of the taxpayer's intent is rarely available. Rowlee v. Commissioner, 80 T.C. 1111 (1983). The taxpayer's entire course of conduct may be examined to establish the requisite fraudulent intent. Stone v. Commissioner, 56 T.C. 213, 223-224 (1971); Otsuki v. Commissioner, 53 T.C. 96, 105-106 (1969). However, fraud may not be found under circumstances which at the most create only suspicion. Davis v. Commissioner, 184 F.2d 86, 87 (10th Cir. 1950). Badges *226 of fraud which may be taken into account include: (1) The making of false and inconsistent statements to revenue agents, Grosshandler v. Commissioner, 75 T.C. 1, 20 (1980); (2) the filing of false documents, Stephenson v. Commissioner, 79 T.C. 995, 1007 (1982), affd. 748 F.2d 331 (6th Cir. 1984); (3) understatements of income; (4) inadequate records; (5) failure to file tax returns; (6) implausible or inconsistent explanations of behavior; (7) concealment of assets; and (8) failure to cooperate with tax authorities, Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir 1986), affg. a Memorandum Opinion of this Court. In determining the presence of fraud we may also consider the native ability and the training and experience of the party involved. Iley v. Commissioner, 19 T.C. 631, 635 (1952); Plunkett v. Commissioner, 465 F.2d 299, 303 (7th Cir. 1972). This includes a party's education. Drobny v. Commissioner, 86 T.C. 1326, 1349 (1986). Respondent cites petitioners' failure to disclose a bank account that had been closed in August 1981 as an indicia *227 of fraud. On several occasions petitioners requested all account information from the bank, and they provided the IRS copies of all information obtained. Nevertheless, the IRS ultimately learned of the undisclosed account by summons to the bank. We infer that the summons more likely than not requested the information the IRS desired more accurately than Mr. Waller's requests. Respondent's failure to show that the bank ever provided the account information to petitioners at their request leads us to conclude that petitioners' failure to disclose this account was not due to active concealment. Respondent also cites basis overstatements for depreciable equipment purchased in 1981 return as indicative of fraud. The basis overstatements appear to be caused by reporting the adjusted basis of equipment purchases at an approximate gross sales price, rather than properly taking into account the cash and adjusted basis of old property exchanged for the new. Petitioners' return preparer testified that she called for the equipment and depreciation information and that she did not ask for or receive invoices. Thus, it appears from the record the overstatement of depreciable basis in equipment *228 was due to a lack of communication. Similarly, having examined the demeanor of the witnesses at trial, we conclude there was a lack of communication between petitioners and the examining agents during many stages in the examination. Mr. Waller was embarrassed to admit to the agents that he could not read. We are convinced that Mr. Waller's lack of understanding what the agents were asking for, and his failure to remember events with the specificity desired, was taken by the agents to be an evasive response. Moreover, due to Mr. Waller's inability to read, he was unable to adequately respond to questions about documents, especially documents reflecting transactions he may not remember. [3]
A page in petitioners' checks received ledger reflecting the total amounts received from customers during the year includes a $ 42,017.50 amount received *229 from a specific customer that a line has been drawn through. Petitioners' daughter deleted this item from the copy of the list she prepared and included with the income tax return materials given to the income tax return preparer. Respondent has not shown the omission was anything other than inadvertent error. The final indicia of fraud respondent cites repeatedly is some variation on the theme that petitioners underreported a significant amount of income while their net worth increased significantly. The mere failure to report income is not sufficient to establish fraud. Merritt v. Commissioner, 301 F.2d 484, 487 (5th Cir. 1962). Based upon the record as a whole, respondent has not carried his burden of proving Mr. Waller fraudulently filed his 1981 and 1982 income tax returns. Fraud is not imputed from one spouse to another. In the case of a joint return, respondent must prove fraud as to each spouse charged for the addition to tax. Sec. 6653(b); Hicks Co. v. Commissioner, 56 T.C. 982, 1030 (1971), affd. 470 F.2d 87 (1st Cir. 1972); Stone v. Commissioner, supra at 227-228. Respondent similarly *230 has not carried his burden in proving Mrs. Waller's fraudulent intent. (b). NEGLIGENCE Respondent alternatively determined petitioners are liable for the section 6653(a)(1) and (2) addition to tax for negligence. Negligence is a lack of due care or failure to do what a reasonable, prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). Respondent's determination of a taxpayer's negligence or intentional disregard of rules and regulations is presumptively correct, and petitioners bear the burden of proving they acted reasonably, prudently, and with due care in preparing and filing their income tax returns. Bixby v. Commissioner, 58 T.C. 757, 791-792 (1972). Petitioners' daughter prepared the summary sheets used to prepare their income tax returns for the years in issue. The income tax returns were prepared by a paid income tax return preparer. Petitioners testified they do not know how to prepare an income tax return and that they relied, as they always have, on their income tax return preparer to prepare their returns accurately. As a general rule, the duty of filing accurate returns cannot *231 be avoided by placing responsibility on a tax return preparer. Metra Chem. Corp. v. Commissioner, 88 T.C. 654, 662 (1987). Petitioners have failed to provide any cogent reasons for departing from the general rule in this case. Respondent's alternative determination of negligence is sustained. 3. STATUTE OF LIMITATIONS Respondent primarily contends the limitations period is open for 1981 and 1982 due to the section 6501(c)(1) exception. Section 6501(c)(1) provides, in relevant part, that in the case of the filing of "a false or fraudulent return with the intent to evade tax, the tax may be assessed * * * at any time." Since we have found no fraud, the section 6501(c)(1) exception to the three-year period of limitations does not apply. Respondent alternatively contends that the period of limitations is open for six years for 1981 and 1982 under section 6501(e)(1)(A) because omitted income exceeds 25 percent of gross income stated in those returns. Gross income of a trade or business is "the total of the amounts received or accrued from the sale of goods or services (if such amounts are required to be shown on the return) prior to diminution by the cost of *232 such sales or services." Section 6501(e)(1)(A)(i). Respondent must show that the unreported net income results from omitted gross income rather than excessive deductions. Courtney v. Commissioner, 28 T.C. 658, 668(1957); Hurley v. Commissioner, 22 T.C. 1256, 1264-1265 (1954), affd. 233 F.2d 177 (6th Cir. 1956). Petitioners conceded omitting $ 1,967.02 from the sale of cattle from their 1981 return. Respondent has not identified any other omissions of gross income, and has fallen short in proving the required omissions amount. Even though respondent's agents testified there were sources of unreported income, respondent must prove the amount of omitted gross income. We have no doubt that the unreported adjusted gross income in this case is attributable to both unreported gross income and overstated deductions. Respondent resorted to the net worth method because petitioners' books were unreliable. The examining agents could not trace the construction business income and expense to petitioners' returns. Respondent has not carried his burden of proving the extended period of limitations applies for 1981. For 1982, petitioners *233 omitted $ 42,017.50 construction company revenues received from a single customer, $ 4,305.14 from the sale of timber, and $ 2,575.41 from the sale of cattle which Mr. Waller kept as a hobby. These omissions exceed 25 percent of the gross income stated in their return. Thus, the statute of limitations does not bar respondent from assessing the deficiency for 1982 because the notice of deficiency was mailed within six years of the date the 1982 return was filed. 4. SECTION 6661(a) ADDITION TO TAX Section 6661(a) provides for an addition to tax if there is a substantial understatement of income tax. The understatement of tax respondent determined for 1982 is substantial within the meaning of section 6661(b)(1)(A) and, accordingly, respondent's determination is sustained for 1982. To reflect respondent's concessions, and the foregoing, Decision will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code as amended and in effect for the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
*. 50 percent of the interest due on the underpayment attributable to fraud.↩
2. Mr. Waller's "construction" business consisted of "cutting and clearing right of ways and clearing timber" (i.e., ground maintenance), and "hauling dirt and doing fill work" (i.e., land grading and excavation). For convenience, we adopt petitioners' terminology, and refer to his business generally as his construction business.↩
3. For example, from his testimony, it was readily apparent that Mr. Waller did not know what the brackets around the adjusted gross income figure on the 1982 return signified.↩