T.C. Memo. 2004-250

UNITED STATES TAX COURT

RITA GRANT NDIRIKA, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 10008-03.          Filed November 3, 2004.

Rita Grant Ndirika, pro se.

<u>Roger W. Bracken</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

CHIECHI, <u>Judge</u>:  Respondent determined the following defi-
ciency in, and additions to, petitioner's Federal income tax
(tax) for her taxable year 2000:

| | | Additions to Tax | | |
|---|---|---|---|---|
| Year | Deficiency | Sec. 6651(a)(1)[1] | Sec. 6651(a)(2) | Sec. 6654(a) |
| 2000 | $76,851 | $10,472.40 | $4,421.68 | $2,322.15 |

In respondent's answer, respondent conceded the addition to tax under 6651(a)(2) for petitioner's taxable year 2000 and alleged an increase for that year in the addition to tax under section 6651(a)(1).

The issues remaining for decision are:

(1) Are certain payments that petitioner received from Gardner, Carton & Douglas (GC&D or firm) during 2000 excludable under section 104(a)(2) from petitioner's gross income for that year? We hold that they are not.

(2) Is petitioner liable for 2000 for the addition to tax under section 6651(a)(1)? We hold that she is.

(3) Is petitioner liable for 2000 for the addition to tax under section 6654(a)? We hold that she is to the extent stated herein.

### FINDINGS OF FACT

Most of the facts have been stipulated and are so found.

Petitioner resided in Lanham, Maryland, at the time she filed the petition in this case.

During the period that began around 1995 and that ended on

---

[1]All section references are to the Internal Revenue Code in effect for the year at issue. All Rule references are to the Tax Court Rules of Practice and Procedure.

March 15, 2000, GC&D, a law firm, employed petitioner as an attorney. During that period, GC&D made biweekly salary payments to petitioner.

Around late January 2000, GC&D advised petitioner that it intended to discharge her unless she voluntarily resigned from the firm. Shortly thereafter, petitioner informed GC&D that she intended to resign, and petitioner and GC&D began discussing the terms relating to petitioner's resignation.

Around February 2000, GC&D sent petitioner a draft separation, release, and waiver agreement (separation agreement). On or about March 2, 2000, petitioner sent GC&D a memorandum responding to GC&D's draft separation agreement. In that response, petitioner listed certain matters that she wanted GC&D to take into consideration in finalizing the separation agreement, including the following with respect to the consideration that she was to receive under that agreement:

I.   Valuable Consideration

  A.   Severance pay for 12 months or 1 year from
       termination date of March 15, 2000 at $93,750
       annual rate <u>or</u>

       Severance pay for * * *[2] months from termi-
       nation date as of March 15, 2000 at $125,000
       per year rate retroactive to January 1, 2000.

_____

[2]The number of months set forth in petitioner's response to GC&D's draft separation agreement that is part of the record in this case was illegible.

Election of lump sum due on or before March 30, 2000. Applicable taxes and FICA deductions will be based on current W-4 elections not to exceed total annual deduction amounts reported on 1999 W-2.

On or about March 15, 2000, petitioner and GC&D executed a separation agreement that reflected the final terms to which they had agreed. The separation agreement provided in pertinent part:

I. Valuable Consideration

In exchange for NDIRIKA'S entering into this Agreement, GC&D agrees to provide NDIRIKA with the following consideration:

A. GC&D will pay NDIRIKA severance pay in the form of salary continuation at the annualized rate of $93,750, less applicable taxes and FICA for a period of twelve (12) months following the Separation Date (i.e., through March 15, 2001) as defined in Section II below (the "Severance Period"). Such severance pay will be paid, at NDIRIKA'S election, either (i) in equal bi-monthly payments during the Severance Period, on dates corresponding with GC&D's regular payroll dates, or (ii) in one lump sum payment on the first regular payroll date following the Separation Date. Severance will be paid regardless of whether NDIRIKA accepts other employment during the Severance Period.

* * * * * * *

C. NDIRIKA shall also receive a lump sum supplemental severance payment in the amount of $15,000, less applicable taxes and FICA, on the first regular payroll date following the Separation Date.

D. During the Severance Period, NDIRIKA may continue to use her office and telephone in furtherance of her job search, and will continue to be allowed access to her firm voicemail and e-mail, provided NDIRIKA elects to receive her salary continuation severance pay under paragraph A above in equal bi-monthly payments, rather than in one lump sum payment. NDIRIKA will not be required to, nor should she, per-

form work on client matters or any other matter on behalf of GC&D during the Severance Period.  If NDIRIKA elects to receive her salary continuation severance payment in a lump sum under paragraph A(ii) above, she will vacate her office by the end of the business day on the day after the Separation Date and she will be allowed access to her firm voicemail and e-mail for a period of 60 days, ending May 15, 2000.

\*      \*      \*      \*      \*      \*      \*

II.  <u>Termination Date</u>

NDIRIKA hereby voluntarily resigns effective March 15, 2000 (the "Separation Date").

III. <u>Release and Waiver</u>

By signing this Agreement, NDIRIKA hereby releases and waives all legal and equitable claims, rights and causes of action of any kind whatsoever, known and unknown, NDIRIKA has or may have against GC&D, including, individually and collectively, its partners, associates, employees, agents, clients, benefit plans and plan administrators, successors and assigns, as of the date this Agreement is signed by NDIRIKA.  This includes, but is not limited to, all claims relating to NDIRIKA'S past relationship with and resignation from employment with GC&D.

This release and waiver includes, but is not limited to:

A.    any claims for wrongful termination, termination in violation of public policy, defamation, intentional infliction of emotional distress and any other common law claims;

B.    any claims for the breach of any implied, written or oral contract, including, but not limited to, any contract of employment;

C.    any claims of discrimination, harassment or retaliation based on such things as age, marital status, citizenship, national origin, race, religion, sex, sexual orientation, pregnancy, including pregnancy-related disability, or physical or mental disability or

medical condition unrelated to the ability to perform;

D. any claims for payments of any nature, including but not limited to wages, overtime pay, severance pay, vacation pay, commissions, bonuses and benefits or the monetary equivalent of benefits; and

E. any claims to reinstatement, rehire or re-employment.

This release and waiver also includes claims, rights and causes of action that may arise under any federal, state, local or District of Columbia statutes, ordinances, rules, regulations and orders, including but not limited to any claim, right or cause of action based on the Fair Labor Standards Act, Title VII of the Civil Rights Act of 1964, the Family and Medical Leave Act, the Americans with Disabilities Act, the Age Discrimination in Employment Act, the Civil Rights Acts of 1866, 1871, and 1991, the Employee Retirement Income Security Act of 1974, the District of Columbia Human Rights Act, the District of Columbia Family and Medical Leave Act of 1990, the District of Columbia Parental Leave Law, the District of Columbia Employment Rights of Blind and Physically Disabled Persons, the District of Columbia Wage and Hour Laws, the Illinois Wage Payment and Collection Act, the Illinois Human Rights Act, the Cook County Human Rights Ordinance and the Chicago Human Rights Ordinance, as each of them has been or may be amended. NDIRIKA agrees not to file any lawsuit against GC&D or any of the related individuals or entities listed above in this Section III based on any claims released or right waived pursuant to this Agreement. NDIRIKA also agrees to waive her rights to any claims for attorneys' fees and recovery or compensation of any kind which she might otherwise receive as the result of any claim filed by her or on her behalf against GC&D or any of the entities or individuals listed above. GC&D will not oppose NDIRIKA's rights to unemployment compensation.

Notwithstanding the foregoing, this release and waiver does not include any claims which by law may not be waived (such as claims to workers' compensation benefits) and NDIRIKA's covenant not to sue does not

apply to any lawsuit filed by NDIRIKA to enforce this Agreement.

GC&D timely furnished to petitioner Form W-2, Wage and Tax Statement (Form W-2), in which it reported that during 2000 it paid her wages, tips, and other compensation of $126,861.51 and that it withheld Federal income tax of $16,961.36, State income tax of $7,316.44, and employment taxes (i.e., Social Security tax and Medicare tax) totaling $6,580.88. The amount of wages, tips, and other compensation reported in Form W-2 that GC&D furnished to petitioner included the two settlement payments of $93,750 and $15,000 (settlement payments), or a total of $108,750, that petitioner received pursuant to the separation agreement.

After having received Form W-2 from GC&D, petitioner did not contact the firm to inform it that GC&D had improperly reported the settlement payments as wages, tips, and other compensation in that form.

At a time not disclosed by the record during 2000, petitioner received two early retirement or pension distributions of $66,731.45 and $21,059.02, respectively, from The Northern Trust Company (Northern Trust) in its capacity as the fiduciary for the Gardner, Carton & Douglas Plan. Northern Trust timely furnished to petitioner two Forms 1099-R, Distributions From Pensions, Annuities, Retirement or Profit-Sharing Plans, IRAs, Insurance Contracts, etc. (Forms 1099-R). Forms 1099-R that Northern Trust furnished to petitioner showed the following information:

| Payer's Name | Recipient | Gross Distribution | Taxable Amount | Federal Income Tax Withheld |
|---|---|---|---|---|
| Northern Trust | Rita Grant Ndirika | $66,731.45 | $66,731.45 | $13,346.29 |

| Payer's Name | Recipient | Gross Distribution | Taxable Amount | Federal Income Tax Withheld |
|---|---|---|---|---|
| Northern Trust | Rita Grant Ndirika | $21,059.02 | $21,059.02 | $0 |

During 2000, petitioner received interest income of $749 from HEW FCU. HEW FCU timely furnished to petitioner Form 1099-INT, Interest Income, in which it reported that during 2000 it paid her interest income of $749.

During 2000, petitioner paid expenses totaling $39,060, which qualify as itemized deductions for that year.

Petitioner did not make any estimated tax payments with respect to her taxable year 2000. Nor did she file Form 1040, U.S. Individual Income Tax Return (tax return), for that year. Respondent has no record that petitioner filed a tax return for her taxable year 1999. Respondent's records show that for that year petitioner received wage income of $94,186 and interest income totaling $22. Respondent's records also show that petitioner paid mortgage interest of approximately $23,000 during that year.[3]

Respondent issued to petitioner a notice of deficiency (notice) for her taxable year 2000. In that notice, respondent

---

[3]Respondent's records are not part of the record in this case. A revenue agent who had reviewed respondent's records with respect to petitioner's taxable year 1999 testified that those records indicated, inter alia, that petitioner paid between $22,000 and $23,000 of mortgage interest during that year.

determined, inter alia, that petitioner is not entitled to exclude from her gross income any of the payments that she received during that year from GC&D, Northern Trust, and HEW FCU. Respondent further determined, inter alia, that petitioner is liable for additions to tax under sections 6651(a)(1) and (2) and 6654(a), respectively. As discussed above, in the answer respondent conceded the addition to tax under section 6651(a)(2).

OPINION

Respondent concedes that section 7491 is applicable in the instant case. With respect to section 7491(a), respondent maintains that petitioner has not introduced credible evidence under section 7491(a)(1) or complied with the applicable requirements of section 7491(a)(2). Therefore, according to respondent, the burden of proof with respect to respondent's deficiency determination for petitioner's taxable year 2000 does not shift to respondent. On the record before us, we find that petitioner has failed to carry her burden of establishing that she has complied with the applicable requirements of section 7491(a)(2). On that record, we further find that petitioner has not introduced credible evidence with respect to any factual issue relevant to the Court's determining whether to sustain respondent's deficiency determination at issue. On the record before us, we conclude that petitioner has the burden of proving that that determination is wrong. See Rule 142(a); Welch v. Helvering, 290

U.S. 111, 115 (1933).

Payments at Issue

It is petitioner's position that approximately $100,000 (payments at issue) of the payments that she received pursuant to the separation agreement was on account of personal physical injuries or physical sickness and therefore should be excluded from her gross income under section 104(a)(2).[4]  It is respondent's position that petitioner is not entitled to exclude from her gross income under section 104(a)(2) the payments at issue, or any other payments, that she received during 2000.

Section 61(a) provides the following sweeping definition of the term "gross income":  "Except as otherwise provided in this subtitle, gross income means all income from whatever source derived".  The regulations promulgated thereunder specifically provide that compensation for services, such as termination or severance pay, is included within the definition of gross income. See sec. 61(a)(1); sec. 1.61-2(a)(1), Income Tax Regs.  Not only is section 61(a) broad in its scope, Commissioner v. Schleier, 515 U.S. 323, 328 (1995), exclusions from gross income must be narrowly construed, id.; United States v. Burke, 504 U.S. 229, 248 (1992).

Section 104(a)(2), on which petitioner relies, provides that

---

[4]The Court ordered the parties to file posttrial briefs. Petitioner failed to do so.

gross income does not include:

> (2) the amount of any damages (other than punitive damages) received (whether by suit or agreement and whether as lump sums or as periodic payments) on account of personal physical injuries or physical sickness;

The regulations under section 104(a)(2) provide in pertinent

part:

> The term "damages received (whether by suit or agreement)" means an amount received (other than workmen's compensation) through prosecution of a legal suit or action based upon tort or tort type rights, or through a settlement agreement entered into in lieu of such prosecution.

Sec. 1.104-1(c), Income Tax Regs.

The Supreme Court summarized the requirements of section

104(a)(2) as follows:

> In sum, the plain language of § 104(a)(2), the text of the applicable regulation, and our decision in Burke establish two independent requirements that a taxpayer must meet before a recovery may be excluded under § 104(a)(2). First, the taxpayer must demonstrate that the underlying cause of action giving rise to the recovery is "based upon tort or tort type rights"; and second, the taxpayer must show that the damages were received "on account of personal injuries or sickness." * * *

Commissioner v. Schleier, supra at 336-337.

When the Supreme Court issued its opinion in Commissioner v.

Schleier, supra, section 104(a)(2), as in effect for the year at

issue in Schleier, required, inter alia, that, in order to be

excluded from gross income, an amount of damages had to be

received "on account of personal injuries or sickness." After

the Supreme Court issued its opinion in <u>Schleier</u>, Congress amended (1996 amendment) section 104(a)(2), effective for amounts received after August 20, 1996, by adding the requirement that, in order to be excluded from gross income, any amounts received must be on account of personal injuries that are physical or sickness that is physical.[5]  Small Business Job Protection Act of 1996, Pub. L. 104-188, sec. 1605, 110 Stat. 1755, 1838-1839.  The 1996 amendment does not otherwise change the requirements of section 104(a)(2) or the analysis set forth in <u>Commissioner v. Schleier</u>, <u>supra</u>; it imposes an additional requirement for an amount to qualify as an exclusion from gross income under that section.

Where damages are received pursuant to a settlement agreement, such as is the case here, the nature of the claim that was the actual basis for settlement controls whether such damages are excludable under section 104(a)(2).  <u>United States v. Burke</u>, <u>supra</u> at 237.  The determination of the nature of the claim is factual.  <u>Robinson v. Commissioner</u>, 102 T.C. 116, 126 (1994), affd. in part, revd. in part, and remanded on another issue 70

---

[5]Sec. 104(a) provides that emotional distress is not to be treated as a physical injury or physical sickness for purposes of sec. 104(a)(2), except for damages not in excess of the amount paid for medical care attributable to emotional distress.  In this connection, the legislative history of the 1996 amendment states:  "It is intended that the term emotional distress includes symptoms (e.g., insomnia, headaches, stomach disorders) which may result from such emotional distress."  H. Conf. Rept. 104-737, at 301 n.56 (1996), 1996-3 C.B. 741, 1041 n.56.

F.3d 34 (5th Cir. 1995); Seay v. Commissioner, 58 T.C. 32, 37 (1972). Where there is a settlement agreement, that determination is usually made by reference to it. See Knuckles v. Commissioner, 349 F.2d 610, 613 (10th Cir. 1965), affg. T.C. Memo. 1964-33; Robinson v. Commissioner, supra. If the settlement agreement lacks express language stating what the settlement amount was paid to settle, the intent of the payor is critical to that determination. Knuckles v. Commissioner, supra; see also Agar v. Commissioner, 290 F.2d 283, 284 (2d Cir. 1961), affg. per curiam T.C. Memo. 1960-21. Although the belief of the payee is relevant to that inquiry, the character of the settlement payment hinges ultimately on the dominant reason of the payor in making the payment. Agar v. Commissioner, supra; Fono v. Commissioner, 79 T.C. 680, 696 (1982), affd. without published opinion 749 F.2d 37 (9th Cir. 1984). Whether the settlement payment is excludable from gross income under section 104(a)(2) depends on the nature and character of the claim asserted, and not upon the validity of the claim. See Bent v. Commissioner, 87 T.C. 236, 244 (1986), affd. 835 F.2d 67 (3d Cir. 1987); Glynn v. Commissioner, 76 T.C. 116, 119 (1981), affd. without published opinion 676 F.2d 682 (1st Cir. 1982); Seay v. Commissioner, supra.

In support of petitioner's position that the payments at issue are excludable from her gross income under section 104(a)(2), petitioner testified that she had "informed the

management [of GC&D] that I felt that I had a claim related to not only my current pregnancy, but also the fact that I had lost a child in October 1998 * * * and that I intended to pursue that claim when I left."  Petitioner further testified that "To release my pregnancy related claim, I said to the firm, you know, that I wanted a settlement amount equal to a year's salary".  We found petitioner's testimony to be vague, self-serving, uncorroborated, inconsistent with the terms of the separation agreement, and not credible.[6]

As made clear by the following provisions of the separation agreement, the settlement payments received thereunder were salary continuation severance payments.[7]

I.    Valuable Consideration

    In exchange for NDIRIKA'S entering into this
    Agreement, GC&D agrees to provide NDIRIKA with the
    following consideration:

---

[6]At the call of this case from the calendar, petitioner informed the Court that she intended to call as a witness an individual who during 2000 had been the managing partner (partner) of GC&D and who would corroborate her claim that the payments at issue were received on account of personal physical injuries or physical sickness.  At the call of this case for trial, petitioner informed the Court that the partner whom she intended to call "has come down with a case of amnesia".  We infer from petitioner's failure to call that partner that his testimony would not have been favorable to petitioner's position. See Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947).

[7]The separation agreement contains a release and waiver provision that appears to contain boilerplate language, and we do not attribute any significance to that provision.

A.   GC&D will pay NDIRIKA severance pay in the form of salary continuation at the annualized rate of $93,750, less applicable taxes and FICA for a period of twelve (12) months following the Separation Date (i.e., through March 15, 2001) as defined in Section II below (the "Severance Period").  Such severance pay will be paid, at NDIRIKA'S election, either (i) in equal bi-monthly payments during the Severance Period, on dates corresponding with GC&D's regular payroll dates, or (ii) in one lump sum payment on the first regular payroll date following the Separation Date.  Severance will be paid regardless of whether NDIRIKA accepts other employment during the Severance Period.

*       *       *       *       *       *       *

C.   NDIRIKA shall also receive a lump sum supple-mental severance payment in the amount of $15,000, less applicable taxes and FICA, on the first regular payroll date following the Separation Date.

D.   During the Severance Period, NDIRIKA may continue to use her office and telephone in furtherance of her job search, and will continue to be allowed access to her firm voicemail and e-mail, provided NDIRIKA elects to receive her salary continuation severance pay under paragraph A above in equal bi-monthly payments, rather than in one lump sum payment. NDIRIKA will not be required to, nor should she, per-form work on client matters or any other matter on behalf of GC&D during the Severance Period.  If NDIRIKA elects to receive her salary continuation severance payment in a lump sum under paragraph A(ii) above, she will vacate her office by the end of the business day on the day after the Separation Date and she will be allowed access to her firm voicemail and e-mail for a period of 60 days, ending May 15, 2000.

Petitioner did not introduce any reliable evidence that persuades us that the separation agreement, which treats the payments at issue as salary continuation severance payments, incorrectly characterized such payments.  Petitioner had the opportunity to challenge the characterization of the settlement

payments as salary continuation severance payments when (1) she responded to GC&D's draft separation agreement, (2) signed the separation agreement, and (3) received Form W-2 from GC&D in which the firm reported such payments as wages, tips, and other compensation. She did not.

Based upon our examination of the entire record before us, we find that the salary continuation severance payments that GC&D made to petitioner pursuant to the separation agreement are gross income. See sec. 61(a)(1); sec. 1.61-2(a)(1), Income Tax Regs. On that record, we further find that petitioner has failed to carry her burden of establishing that the nature of the claim that was the actual basis for the payments made pursuant to the separation agreement was certain personal physical injuries or physical sickness that she suffered while working for GC&D relating to (1) a miscarriage that she may have had, (2) a pregnancy that she may have had when she left the firm, or (3) another cause. On the record before us, we find that petitioner has failed to carry her burden of establishing that she received the payments at issue on account of personal physical injuries or physical sickness. On that record, we further find that petitioner has failed to carry her burden of establishing that she is entitled under section 104(a)(2) to exclude the payments at issue from her gross income.

## Addition to Tax Under Section 6651(a)(1)

Respondent determined that petitioner is liable for the addition to tax under section 6651(a)(1). Section 6651(a)(1) imposes an addition to tax for failure to file a tax return on the date prescribed for filing, unless petitioner proves that such failure to file was due to reasonable cause and not willful neglect. Sec. 6651(a)(1); Higbee v. Commissioner, 116 T.C. 438, 447 (2001).

Respondent must carry the burden of production with respect to the addition to tax under section 6651(a)(1). Sec. 7491(c); Higbee v. Commissioner, supra at 446-447. To satisfy respondent's burden of production, respondent must come forward with "sufficient evidence indicating that it is appropriate to impose" the addition to tax. Higbee v. Commissioner, supra at 446.

Although at trial petitioner appeared to concede the addition to tax under section 6651(a)(1), it is not altogether clear to the Court that she in fact conceded that addition to tax. Consequently, we shall address whether petitioner is liable for the addition to tax under section 6651(a)(1) for her taxable year 2000.

We have found that petitioner did not file a tax return for her taxable year 2000. On the record before us, we find that respondent has satisfied respondent's burden of production under section 7491(c) with respect to the addition to tax under section

6651(a)(1). On that record, we further find that petitioner has failed to carry her burden of showing that her failure to file a tax return for 2000 was due to reasonable cause, and not due to willful neglect.

Respondent conceded in the answer the addition to tax under section 6651(a)(2) determined in the notice. As a result, according to respondent, section 6651(c)(1) does not apply. We agree with respondent. On the record before us, we find that respondent has established that the amount of the addition to tax under section 6651(a)(1) that respondent determined in the notice should be increased.[8]

## Addition to Tax Under Section 6654(a)

Respondent determined that petitioner is liable for the addition to tax under section 6654(a). Section 6654(a) imposes an addition to tax in the case of an underpayment of estimated tax by an individual.[9]

---

[8]The increase in the addition to tax under 6651(a)(1) that we have sustained will be determined by the parties under Rule 155.

[9]For purposes of sec. 6654(a), it is necessary to determine whether there is an underpayment of a required installment of estimated tax. See sec. 6654(a) and (b). In this connection, the amount of any required installment is 25 percent of the required annual payment. Sec. 6654(d)(1)(A). The required annual payment is equal to the lesser of (1) 90 percent of the tax shown in the tax return for the taxable year or, if no tax return was filed, 90 percent of the tax for such year, or (2) if the individual filed a tax return for the preceding taxable year, 100 percent of the tax shown in such return. Sec. 6654(d)(1)(B).

Respondent has the burden of production with respect to the addition to tax under section 6654(a). Sec. 7491(c); Higbee v. Commissioner, supra at 446-447. We have found that petitioner did not file a tax return for her taxable year 2000 and that respondent has no record that petitioner filed a tax return for her taxable year 1999. Petitioner introduced no reliable evidence establishing that she filed a tax return for either of those years. We have also found that petitioner did not make any estimated tax payments with respect to her taxable year 2000, although the amounts of tax withheld during that year are treated under section 6654(g)(1) as estimated tax payments.

We find that the record contains evidence from which the parties, in the computations under Rule 155, will be able to calculate the amount of any required installment by petitioner within the meaning of section 6654(d)(1) with respect to her taxable year 2000 and the amount, if any, of an underpayment of estimated tax for that year. In the event that such calculation were to establish that petitioner underpaid her estimated tax for her taxable year 2000, we find that respondent has satisfied respondent's burden of production with respect to the addition to tax under section 6654(a) for that year. In that event, we further find on the instant record (1) that none of the exceptions in section 6654(e) applies and (2) that petitioner is liable for the addition to tax under section 6654(a) for her

taxable year 2000.

In the event that the calculation relating to section 6654 were to establish that petitioner did not underpay her estimated tax for her taxable year 2000, we find that respondent has not satisfied respondent's burden of production with respect to the addition to tax under section 6654(a) for that year and that petitioner is not liable for such addition to tax.

We have considered all of the contentions and arguments of petitioner that are not discussed herein, and we find them to be irrelevant and/or without merit.

To reflect the foregoing and the concessions of the parties,

<u>Decision will be entered</u>

<u>under Rule 155</u>.